UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| United States of America for the use<br>of Pioneer Construction Company, Inc.<br>and<br>Pioneer Construction Company, Inc.<br><br>Plaintiffs,<br><br>v.<br><br>Pride Enterprises, Inc.<br>and<br>Great American Insurance Company<br>and<br>Jeffrey M. Brown Associates, Inc.,<br><br>Defendants. | )<br>)<br>)<br>) Civil Action No. 3:07-cv-00994-TIV<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

# BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

VENZIE, PHILLIPS & WARSHAWER

By:   BRUCE L. PHILLIPS, ESQUIRE
I.D. No. 7989
2032 Chancellor Street
Philadelphia, Pennsylvania 19103
(215) 567-3322

Attorney for Plaintiff
Pioneer Construction Company, Inc.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| United States of America for the use of Pioneer Construction Company, Inc. and | ) ) ) |
| Pioneer Construction Company, Inc. | ) Civil Action No. 3:07-cv-00994-TIV |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| Pride Enterprises, Inc. | ) |
| and | ) |
| Great American Insurance Company | ) |
| and | ) |
| Jeffrey M. Brown Associates, Inc., | ) |
| | ) |
| Defendants. | ) |

**ORDER**

AND NOW, this        day of                    , 2008, on the motion of

defendants Pride Enterprises, Inc., Jeffrey M. Brown Associates, Inc. and Great

American Insurance Company for summary judgment, and after having considered

the points, authorities and arguments in support of and in opposition to the motion,

it is HEREBY ORDERED that the motion is DENIED.

BY THE COURT:

_____

Thomas I. Vanaskie, J.

# TABLE OF CONTENTS

**Page**

I.     Brief Statement of the Case............................................ 1

II.    Statement of Facts..................................................... 4

III.   Statement of Questions Involved.................................... 9

IV.   Argument.................................................................. 10

      A.     The Court May Properly Consider The Course Of
             Conduct Of Pride And Brown In Dealing With
             Pioneer In Determining That Pride/Brown Waived
             Or Are Estopped To Assert The Partial Releases As
             Defense(s) To Pioneer's Claim For Delay Damages...... 10

      B.     As The Miller Act Surety For Pride, GAIC Can Be Held
             Liable To Pioneer For "Out-of-Pocket Costs" Of Delay... 16

V.    Conclusion.............................................................. 17

      Certificate Of Compliance........................................... 18

i

# TABLE OF CITATIONS

Page

*Atlantic Richfield Company v. Razumic*,
480 Pa. 336, 390 A.2d 736 (1978)............................................. 14

*G.R. Sponaugle & Sons, Inc. v. Hunt Construction Group, Inc.*, 366 F. Supp. 2d 236 (M.D. Pa. 2004)...................... 10

*Intermetal Mexicana, S.A. v. Insurance Company of North America*, 1986 WL10547(E.D. Pa.1986)........................... 14

*Kenneth Hantman, Inc. v. The Whiting-Turner Contracting Company*, 2008 WL 4072591 (E.D. Pa. 2008).............. 12

*Kleinknecht Elec. Co., Inc. v. Jeffrey M. Brown Assoc., Inc.*,
2006 WL 1005007 (C.C.P. Phila. 2006)................................... 10

*Langer v. Monarch Life Insurance Company*,
879 F.2d 75, 81 (3d Cir. 1989)............................................ 14

*Somerset Community Hospital v. Allan B. Mitchell & Assoc.*,
454 Pa. Super. 188, 197, 685 A. 2d 141, 146 (1996)..................... 12

*United States for the use of Joseph P. Sulzbach, Inc. v. Cottman Mechanical Contractors, Inc.*,
1993 WL 533114 (E.D. Pa.)................................................ 16

*Universal Builders, Inc. v. Moon Motor Lodge, Inc.*,
430 Pa. 550, 560, 244 A.2d 10, 13 (1968)................................ 12

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| United States of America for the use<br>of Pioneer Construction Company, Inc.<br>and<br>Pioneer Construction Company, Inc.<br><br>Plaintiffs,<br><br>v.<br><br>Pride Enterprises, Inc.<br>and<br>Great American Insurance Company<br>and<br>Jeffrey M. Brown Associates, Inc.,<br><br>Defendants. | )<br>)<br>)<br>) Civil Action No. 3:07-cv-00994-TIV<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Pursuant to LR 7.8 and 56.1, plaintiff Pioneer Construction Company, Inc.

("Pioneer") respectfully submits the following points and authorities in opposition

to the motion for summary judgment by defendants Pride Enterprises, Inc.

("Pride"), Jeffrey M. Brown Associates, Inc. ("Brown"), and Great American

Insurance Company ("GAIC").

**I.    Brief Statement of the Case.**

The case arises out of a project commissioned by the government of the

United States, National Park Service ("NPS"), for construction of improvements

("Front Lawn Visitor Service and Site Improvements") at the Grey Towers National Historic Landmark in Milford, Pike County, PA ("Project"). Pride was the prime contractor to the NPS for construction of the Project. Pioneer was a subcontractor to Pride for construction of sitework, including paving, tree removal and concrete construction. GAIC is the "Miller Act" contract bond surety (performance and payment bonds) for Pride. The legal relationship between Pride and Brown is disputed, but it is undisputed that Brown was directly involved with administration of the subcontract between Pride and Pioneer, and with construction management of the Project throughout 2004-2005.

The NPS issued its Notice to Proceed to Pride on December 3, 2003, directing Pride to proceed with the work on that date, and instructing Pride that the Contract Time for construction of the Project would expire on November 26, 2004. There is no genuine dispute between plaintiff and defendants that Pioneer was delayed, disrupted and interfered with ("delays") in its efforts to perform and complete its work on the Project, and that Pioneer incurred increased and unanticipated costs as a result of the delays.

In January, 2007, Pioneer presented Pride with Pioneer's "Claim for Equitable Adjustment to Subcontract Price and Time" ("Claim") in a total amount of $799,925, which included the unpaid contract balance of $66,763. Selected parts of the Claim, which as submitted to Pride comprises three (3) volumes of

2

documents, are Exhibit G to defendants' motion papers. Except for the unpaid contract balance, the Claim is entirely based on the delays which Pioneer was caused to incur on the Project.

By writing dated March 21, 2007, Pride's chief executive officer, Craig Williams, certified Pioneer's Claim to the United States government. That certification included that the Claim "is made in good faith; that the supporting data are accurate and complete...; [and] that the amount requested accurately reflects the contract adjustment for which [Pride] believes the Government is liable". On December 14, 2007, the NPS's Contracting Officer issued his "Final Decision" denying the Claim in its entirety. While the Contracting Officer agreed that "Pioneer incurred delays under its subcontract with Pride", he denied the Claim for the reason that "the Government compensated Pride for these delays on the contract, including delays incurred by Pioneer, through bilateral modifications that contained releases from Pride". Defendants' Ex H. at 5. The Contracting Officer advised that "[t]o the extent that Pioneer incurred additional costs and delays for these events, Pioneer needs to seek redress through Pride". *Id.*

The defendants now move for summary judgment on the basis of 17 form "partial releases" which Pioneer executed during the period July 13, 2004 to December 5, 2005. GAIC also argues for summary judgment on the grounds that

3

"delay damages are not recoverable against payment bond sureties absent bond language not present here...". Defendants' Mem. at 2-3.

As of October 17, 2008, the parties have not conducted any depositions upon oral examination. And contrary to defendants' point of argument set forth in their "Introduction", *Id.*, "[t]he facts relevant to the [partial] releases" are most certainly **not** "admitted and indisputable". That they are not "admitted and indisputable" is plainly demonstrated by Pioneer's statement of material facts, as supported by the declaration of Robert Jenkins. What depositions upon oral examination will confirm is that Pride and Pioneer engaged in a course of conduct with Pioneer throughout 2004-2005 which bars defendants, by waiver and estoppel, from attempting to use the "partial releases" as a defense to Pioneer's claims in this civil action.

## II.    Statement of Facts.

As is made clear by Pioneer's statement of material facts filed in accordance with LR 56.1, numerous genuine issues of material fact exist with regard to the course of conduct engaged in by Pride and Brown in their dealings with Pioneer throughout 2004-2005, particularly as to the central issue of whether Pride and Brown waived the partial releases, or are otherwise estopped to assert such releases, as defenses to Pioneer's claims for damages caused by the delays. The "Statement of Material Facts" contained in defendants' memorandum is nothing

4

more than a reiteration of their so-called statement of "undisputed material facts",
all of which, to the extent they are "material" to the issue(s) for decision on the
pending motion, have been placed in genuine dispute by Pioneer's statement of
material facts.

The form "partial release" which is referred to at Article 2.3 of the form
Subcontract was not attached to the Subcontract when it was presented to Pioneer,
signed by Pioneer, and returned to Pride. The form partial release was not
presented to Pioneer until July 12, 2004, after Pioneer had been engaged on the
Project for at least 4½ months, and after Pioneer had submitted its Applications for
Payment Nos. 1 through 5. The "partial release" forms for Pioneer's Applications
Nos. 2-5 were signed by Pioneer on July 13, 2004, **after** Pioneer had received
payments from Pride totaling not less than $107,194.66. Neither Pride nor Brown
ever provided Pioneer with the form which is referred to in Article 2.3 as "Exhibit
E", which form is believed to be a "final release".

During the period that Pioneer was engaged in attempting to perform its
work on the Project, and particularly during 2004-2005, Pioneer repeatedly placed
Pride and Brown on written notice of the serial delays, disruptions and
interferences it was being caused to incur as the direct result of defects and
deficiencies in the Contract Documents (plans and specifications) published by the
NPS for construction of the Project, and as the direct result of Pride's and Brown's

failures and refusals to manage and coordinate the work in a reasonably competent manner. See Pioneer's Exhibit A. For example, by letter dated September 24, 2004, addressed to Pride's Craig Williams (document PCCO00308, Ex. A), Pioneer, by Robert Jenkins, requested a meeting with representatives of Pride, Brown and NPS "to address the significant inefficiencies and delays that [Pioneer] has encountered during the whole of this project". In that letter, Pioneer advised that it "can no longer afford to work in this manner which causes financial loss and jeopardizes our reputation with our subcontractors. [Pioneer] would like to reiterate our previous letters regarding these same issues that still have not been resolved". On October 14, 2004, Mr. Jenkins addressed a letter to Brown's Project Manager, Dennis Herr (document PCCO00344, Ex. A) stating, inter alia:

> "[Pioneer] has requested information from you about our unresolved issues to no avail. On 8-6-04 I wrote you a letter regarding all of the delays.... I notified you that [Pioneer] would be billing the equipment on a stand by rate as of 8-10-04. I have received no response to this letter.
>
> It is now three (3) months later. All equipment that has been on site between 8-10-04 and 10-12-04 that was not being used will be billed at the rates provided on 8-6-04. Back up will be provided for dates of use and mobilizations and demobilizations. From this point forward, mobilization and demobilization costs will be charged accordingly".

A copy of Mr. Jenkins' letter went to Pride's Craig Williams.

On November 1, 2004, Pioneer's officer/vice-president, Michael Cavage, addressed a letter to Pride's Project Executive, Steve Saddlemire, (document

PCCO00436, Ex. A). In that letter, a copy of which went to Pride's Craig

Williams, Mr. Cavage states, inter alia:

> "I hold firmly that Pioneer has continuously made efforts to expedite
> this project for Pride and Brown. The true problem on this project
> lies with management not processing required change orders, RFI's
> and transmittals.
>
> …
>
> I do not need to remind you that the… project was held up for four
> months due to the E&S plan. Since that time, [Pioneer] has spent
> much time re-engineering this project for you. Most of the re-
> engineering falls into the category of a design/build project.
> Design/build is not a requirement of our contract".

In his letter, Mr. Cavage requests that he be advised "as to how Pride and [Brown]

will be accommodating [Pioneer] to expedite our work and minimize back charges

to [Brown] and NPS".

On February 17, 2005, Pride's Project Executive, Steve Saddlemire,

addressed a letter to Robert Jenkins (document PCCO00612, Ex. A), a copy of

which went to Craig Williams, advising that "Pride/[Brown] is investigating a

delay claims (sic) against [NPS]" and that Pride/Brown were then "looking for

your assistance in documenting this position". Pride's Project Executive requested

that "you review your documentation and consult with outside resources to

establish a credible position for a delay claim. You must maintain the perspective

that Pride/[Brown] and/or yourselves have not influenced the position in anyway".

7

On October 10, 2005, Brown's Project Superintendent/Construction Manager, Joseph Mirin, sent an e-mail to Robert Jenkins and others, with a copy going to Craig Williams and others, (document PCCO00913, Ex. A) concerning "Procurement of Claim Information". In that communication, Brown's representative advises Pioneer that Pioneer is "to procure all Claim information pertaining to the…Project…". He further advises that a meeting had been held on September 28, 2005 with representatives of the NPS at which Pride/Brown's representatives informed NPS's representatives that the Claim information "would be available for review in 14 days", and he informs Pioneer that "[t]his information needs to be detailed as per delays, dates, time durations, modifications and inefficiencies" and that it is "'Crucial' that we submit this information to the government in this format in order to expedite the process of any claims on this project".

Pioneer submitted its Claim to Pride in January, 2007. Pride and Brown reviewed the Claim for at least 1½ months. Neither Pride nor Brown advised Pioneer that they would not certify the Claim by reason of any "partial release" signed by Pioneer. Rather, on March 21, 2007 Pride's Craig Williams certified the Claim to the NPS in accordance with 41U.S.C.§605(c)(1).  Phillips Dec.

On December 14, 2007, the NPS's Contracting Officer denied the Claim in its entirety on the basis of 13 "Bilateral Modifications" that Pride had executed

8

during the period January 16, 2004- October 17, 2006. One of those Modifications (No. 10) was signed by Williams 4 days after Pioneer had been instructed by Brown, with Williams' knowledge, to procure and submit "Claim Information" in support of the delays incurred by Pioneer. That Modification substantially prejudiced Pioneer's Claim, as certified by Williams.

Pioneer had no knowledge of the "Bilateral Modifications" which Pride had entered into with the NPS, and Pride/Brown had advised Pioneer several times that the NPS had refused to grant extensions of the Contract Time. The Change Orders that Pride issued to Pioneer **did not include** any "compensation" for the delays which were the basis for the Claim, as certified by Williams on March 21, 2007.

## III.   Statement of Questions Involved.

A.   Whether the Court may consider the course of conduct engaged in by Pride and Brown in arriving at the determination that they waived the "partial releases", or are estopped to assert them, as a defense to Pioneer's delay claim?

B.   Whether GAIC can be held liable for the delay damages incurred by Pioneer?

Proposed Answers: Yes.

IV.   **Argument.**

    A.   **The Court May Properly Consider The Course Of Conduct Of Pride And Brown In Dealing With Pioneer In Determining That Pride/Brown Waived Or Are Estopped To Assert The Partial Releases As Defense(s) To Pioneer's Claim For Delay Damages.**

      In arguing that Pioneer has released all claims against defendants, Pride/Brown rely on "black letter" rules of law which can be applied to releases in general, *viz.*, "a release is a contract", and they place principal reliance on case decisions where this Court and certain state courts have applied those "black letter" rules to enforce the bar of releases. *E.g.*, *G.R. Sponaugle & Sons, Inc. v. Hunt Construction Group, Inc.*, 366 F. Supp. 2d 236 (M.D. Pa. 2004); *Kleinknecht Elec. Co., Inc. v. Jeffrey M. Brown Assoc., Inc.*, 2006 WL 1005007 (C.C.P. Phila. 2006). They argue that because the partial releases are "clear and unequivocal", "the language of the Releases should be given its ordinary effect", and thus this Court is constrained to apply the releases without regard to any context or evidence of course of conduct. Each of the cases relied upon by defendants is distinguishable from this case on its facts, and defendants are wrong on the law in arguing that this Court may not consider the course of conduct and dealings between Pride/Brown and Pioneer in arriving at a determination that defendants waived or are estopped to assert the partial releases as a defense to Pioneer's claims.

The *Kleinknecht* case was decided on April 10, 2006, by Judge Mark I. Bernstein, one of three judges who were then assigned to the Commerce Program of the Philadelphia Court of Common Pleas. Many of the words and phrases used by Judge Bernstein in his opinion appear in defendants' argument here. Two months after Judge Bernstein issued his opinion in *Kleinknecht*, one of his colleagues on the Commerce Court, Judge Howland Abramson, rendered his opinion in the case of *Carson/Depaul/Ramos v. Driscoll/Hunt*, 2006 WL 2009054, a copy of which is attached. In that case, Judge Abramson was presented with the issue of whether partial releases, there discussed as "Partial Waiver of Claims", automatically barred claims for "impact damages from the inception of the Project through June 25, 2003". Numerous partial releases had been executed by the plaintiff(s) prior to asserting its claim for delay "impact damages". Taking express notice of both the *Kleinknecht* and *Sponaugle & Sons* decisions, Judge Abramson denied defendants' motion for summary judgment, with the following remarks:

> "The [partial releases/waivers of claims] can certainly be read to preclude a subcontractor from subsequently asserting claims where such claims are based on work done prior to the cut-off dates set forth in the [partial releases/waivers]. (Citing *Kleinknecht* and *Sponaugle & Sons*). However, in this case there is evidence that the parties agreed separately in writing [FN3] to allow [plaintiff's] impact claims to be submitted late despite the release language…".

2006 WL 2009054 at *2.

11

In his footnote 3, Judge Abramson discusses "course of conduct" and "oral representations" that can operate under Pennsylvania law to amend or modify a Subcontract's written requirements where that Subcontract contains provisions which expressly prohibit such amendments or modifications, citing ***Somerset Community Hospital v. Allan B. Mitchell & Assoc.***, 454 Pa. Super. 188, 197, 685 A. 2d 141, 146 (1996) and ***Universal Builders, Inc. v. Moon Motor Lodge, Inc.***, 430 Pa. 550, 560, 244 A.2d 10, 13 (1968).

The court in *Driscoll/Hunt* refused to apply the language of the partial releases/waivers as an absolute bar to plaintiff's claims even though each partial release/waiver expressly provided advice that "except listed on the reverse side hereof", claims for additional money are waived, and plaintiff(s) did not "except" or "carve out" any such claims on any of the releases. The partial releases at issue in ***Kenneth Hantman, Inc. v. The Whiting-Turner Contracting Company***, 2008 WL 4072591 (E.D. Pa. 2008), (copy attached) likewise "provided a space for Plaintiff to enumerate any 'claims or circumstances' that would give rise to an action against the [government]". *Id.* at *6. Contrary to the forms of partial release/waivers of claim at issue in *Kleinknecht* and the *Hantman* cases, the forms of partial release on which defendants rely here do not provide any advice for excepting or "carving out" claims, or any space for enumeration of "claims or circumstances" that would give rise to any claim. Even the form of "Release of

12

Claims" included in the Contract Documents published by the NPS includes the advice and spacing for excepting out claims from the scope of the form release Pioneer's Exhibit D. Thus, it is sophistry for defendants to argue here that it was incumbent on Pioneer to "expressly carve out [its delay] claims from the terms" of the form partial releases, where the terms of the forms made no provision therefor, and to suggest that the "conclusion" must follow that "Pioneer's Releases are valid and enforceable, and act as a bar to any claims accruing prior to December 5, 2005, the date of the latest release". Defendants' Mem. at 15-16. The **facts of this case are** that prior to and after each partial release was signed by Pioneer, Pride/Brown were placed on written notice and re-newed notice of the existence of Pioneer's delay claims. This is not a case where Pioneer "changed its mind" after submitting a final release. **The facts of this case are** that commencing not later than February 17, 2005 (see document PCCO00612, Ex. A), Pride was acknowledging Pioneer's delay claims and was requesting documentation to "establish a credible position for a delay claim". The **facts of this case are**, and the facts which distinguish this case from each of the cases cited by defendants are, that after Pioneer had signed the final partial release in December, 2005, Pride's chief executive officer **certified** Pioneer's Claim to the United States government, with full knowledge that the partial releases had been signed.

In deciding the case of *Atlantic Richfield Company v. Razumic*, 480 Pa. 336, 390 A.2d 736 (1978), the Supreme Court of Pennsylvania cited with approval the rule of the Restatement (Second) of Contracts that "course of performance [is] always relevant in interpreting [a] writing", and noted in its footnote #6 that "use of evidence of course of performance to aid interpretation" is not limited to "instances where the writing is ambiguous". The Supreme Court agreed with the Restatement's proposition that

> "[t]he parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning".

400 Pa. at 376, 390 A.2d at 741. That is the law of Pennsylvania as recognized by the United States District Court for the Eastern District of Pennsylvania in *Intermetal Mexicana, S.A. v. Insurance Company of North America*, 1986 WL10547 (copy attached), and the Third Circuit in *Langer v. Monarch Life Insurance Company*, 879 F.2d 75, 81 (3d Cir. 1989). The decision of this Court (Caldwell, J.) in *Sponaugle & Sons* is not to the contrary. There the Court recognized, without mentioning *Razumic*, *International Mexicana*, or *Langer*, that "[t]here is authority for considering course of conduct in interpreting a contract", but declined to consider the course of conduct there at issue due to "the factual circumstances" of that particular case. The factual circumstances that were present in *Sponaugle & Sons* are markedly different from those which exist here. Most significantly, the factual circumstances in *Sponaugle & Sons* did not include **the**

14

**certification of a claim**, by a purported release, to the United States government that included events and circumstances that would otherwise be within the scope of multiple partial releases, which allowed for no excepting or "carving out" of the delay claims. To the extent that the *Sponaugle & Sons* decision can be read as authority for the proposition that course of conduct/performance can only be considered where a writing is ambiguous, Pioneer respectfully submits that the decision is not in accord with the law of Pennsylvania as recognized in *Razumic*, *Intermetal Mexicana*, and *Langer*.

The facts of this case are, and the course of conduct/performance by Pride and Brown establish, that Pioneer's delay claims were not released by any of the forms partial releases, and that Pride and Brown never intended that the delay claims were or would be comprehended by any of the partial releases. For Pride to argue to the contrary necessarily means that Craig Williams knowingly made and filed a false certification with the United States government on March 21, 2007.

Pioneer respectfully submits that defendants' motion for summary judgment must be denied.

15

**B.      As The Miller Act Surety For Pride, GAIC Can Be Held Liable To Pioneer For "Out-of-Pocket Costs" Of Delay.**

The argument posited by GAIC is that it cannot have liability to Pioneer for delay damages "under Pennsylvania law". A copy of the Payment Bond is attached to defendants' motion papers as Exhibit A. It is a "Miller Act" payment bond, and GAIC's liability thereunder is determined by the language of and policies underlying the federal statute. *E.g., **United States for the use of Joseph P. Sulzbach, Inc. v. Cottman Mechanical Contractors, Inc.***, 1993 WL 533114 (E.D. Pa.) (copy attached).

In *Sulzbach*, the District Court cited the case decisions of the several Courts of Appeals which "have held that subcontractors can recover the out-of-pocket costs of delay from a Miller Act surety", *Id*. at *4, and ruled as follows:

> "Payment bonds under the Miller Act protect suppliers of labor and materials to government construction projects by permitting the supplier to sue the surety on the payment bond. The purpose of the statute can only be achieved by permitting a subcontractor to recover for all costs of labor and material supplied in performing under the contract, including amounts incurred because of delay. *See Millers Mutual*, 942 F.2d at 949, 951. This court adopts the interpretation of the Miller Act of the above-cited cases, and holds that out-of-pocket costs of delay are recoverable".

It is the Miller Act and the rules of decision of the federal courts applying the Miller Act which govern here, and those rules of decision require GAIC's motion to be denied.

## V.     Conclusion.

Wherefore, on the basis of all of the above cited points and authorities, and the papers submitted in opposition to defendant's motion, it is respectfully submitted that defendants' motion for summary judgment must be denied.

VENZIE, PHILLIPS & WARSHAWER

Oct. 17, 2008

By: _Bruce L. Phillips._

BRUCE L. PHILLIPS, ESQUIRE
I.D. No. 17989
2032 Chancellor Street
Philadelphia, Pennsylvania 19103
(215) 567-3322

Attorneys for Plaintiff
Pioneer Construction Company, Inc.

17

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief In Opposition To Defendants'

Motion For Summary Judgment complies with LR 7.8 (b) (2), and that it contains

3,590 words (exclusive of caption, signature block, and certifications), using

Microsoft Word 2007, in 14-point Times New Roman font.

VENZIE, PHILLIPS & WARSHAWER

By:_____

BRUCE L. PHILLIPS, ESQUIRE
I.D. No. 17989
2032 Chancellor Street
Philadelphia, Pennsylvania 19103
(215) 567-3322

Attorneys for Plaintiff
Pioneer Construction Company, Inc.

Westlaw.

Not Reported in A.2d                                      Page 1
Not Reported in A.2d, 2006 WL 2009054 (Pa.Com.Pl.)

**H**

Only the Westlaw citation is currently available.
Court of Common Pleas of Pennsylvania, Phil-
adelphia County,
First Judicial District, Civil Trial Division.
CARSON/DEPAUL/RAMOS, A Joint Venture
Ramos/Carson/Depaul, A Joint Venture, Plaintiffs,
v.
DRISCOLL/HUNT, A Joint Venture, Defendant,
v.
Richard Goettle, Inc., Add'l Defendant.
**February Term, 2004 No. 02166.**
**Commerce Program Control No. 091216.**

June 29, 2006.

OPINION

ABRAMSON, J.
**\*1** This case arises out of the construction of Cit-
izens Bank Park, a baseball stadium (the "Project")
built for the Philadelphia Phillies (the "Owner").
The Owner contracted with defendant Driscoll/
Hunt, a Joint Venture ("DH") to act as Construction
Manager on the Project. In that capacity, DH
entered into Subcontract Agreements (the
"Subcontract") with plaintiff Ramos/Car-
son/DePaul, a Joint Venture ("RCD") to install con-
crete foundations for the Project. Towards the end
of the Project, RCD commenced this action to re-
cover from DH over $10 million in impact cost/
delay damages [FN1] that RCD allegedly incurred
during the course of the Project.[FN2]

> FN1. The amounts claimed are in addition
> to the approximately $24 million due (and
> apparently paid) to RCD under the Sub-
> contract.

> FN2. In addition to its breach of contract
> claims, RCD later tried to assert a fraud
> claim based on DH's representations that
> RCD could submit its impact claims late in
> the Project. This court denied RCD's Mo-

tion to Amend because the fraud claim was
essentially duplicative of RCD's breach of
contract claims. In other words, the gist of
RCD's action against DH sounds in con-
tract not in tort. *See Hart v. Arnold,* 884
A.2d 316, 339-340 (Pa.Super.2005).

> The issues presented in this action are
> whether the parties modified their agree-
> ment and, if so, whether DH breached
> the modified agreement. If RCD's evid-
> ence is not sufficient to show that the
> parties altered their agreement, then it is
> not sufficient to show fraud either. If a
> modification is proven, then it does not
> matter whether DH breached the modi-
> fied agreement intentionally, negligently
> or otherwise; RCD's claim is still just for
> breach of contract.

DH's motion for summary judgment is presently be-
fore the court. In its motion, DH argues that RCD's
impact claims are barred as a result of certain re-
leases signed by RCD. RCD argues that the releases
do not speak to its impact claims because RCD
entered into a side agreement with DH to hold such
claims until the end of the Project.

The Subcontract between RCD and DH provides
for the subcontractor to submit impact claims to
DH in writing within certain time frames. *See* DH's
Motion for Summary Judgment ("Motion"), Ex. B,
§§ 10, 18, 21. The Subcontract also provides that
the parties may modify it only in writing:

No Oral Modifications: This subcontract may be
amended only by a written document signed on
behalf of Construction Manager and Subcontract-
or by authorized persons designated in Section 27.

*Id.* at ¶ 35.5.

In February 2003, approximately a year into the
Project, DH and RCD met and subsequently ex-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d
Not Reported in A.2d, 2006 WL 2009054 (Pa.Com.Pl.)

changed letters regarding the understandings reached at that meeting. RCD wrote to DH as follows:

> While we did not have the opportunity to elaborate, it is understood that we have been accruing cost for prior impacts to our work which will be submitted for payment during or at the conclusion of the project.

*See* Response to Motion, Ex. 35. DH responded as follows:

> Additionally, I must go on record since you made reference to impacts. As you are fully aware, we have not been at all satisfied with joint venture's [RCD's] performance on this project and have and will continue to incur costs as a result of delays caused by your joint venture. You indicated that you felt your joint venture was impacted by jobsite issues and that you will submit same. However, I must alert you that the costs incurred by the DH joint venture will be submitted to you at the appropriate time, including any costs submitted by subcontractors.

> In summary, we have both agreed to put theses [sic] issues on the sidelines to get the project completed and will discuss same at the appropriate time.

*See id.,* Ex. 37.

Throughout the Project, both before and after this exchange of letters, RCD obtained periodic progress payments for the work it had completed by submitting forms entitled "Statement of Contractor" ("Statements"). These Statements were required by the Subcontract and contained the following language:

> **\*2** The undersigned certifies further that the work performed and the materials supplied to date as shown on the above represent the actual value of accomplishment under the terms of the Contract (and all authorized changes thereto) between the undersigned and Driscoll/Hunt, a

Joint Venture relating to the above referenced Project. No other monies are claimed to be or are due from Driscoll/Hunt, a Joint Venture except as listed on the reverse side hereof.

*See* Motion, Ex. H. In exchange for each periodic progress payment, RCD also executed a form entitled "Affidavit and Partial Waiver of Claims and Liens and Release of Rights" ("Waivers"). These Waivers were required by the Subcontract and contained the following language:

> The undersigned further represents and warrants ... that he has no other outstanding and unpaid payment applications, invoices, retentions, holdbacks, chargebacks or unbilled work or materials against Driscoll/Hunt, A Joint Venture as of the date of the aforementioned payment application ...

> In addition, for and in consideration of the amounts and sums received, the undersigned hereby waives, releases and relinquishes any and all claims, rights or causes of action whatsoever arising out of or in the course of the work performed on the above-mentioned project, contract or event transpiring prior to the date hereof, excepting the right to receive payment for work performed and properly completed and retainage, if any, after the date of the above mentioned payment application or invoices.

*See id.,* Ex. I.

On September 24, 2003, after executing numerous Statements and Waivers, RCD informed DH by letter that it had incurred $9,245,976.00 in impact damages from the inception of the Project through June 25, 2003. *See id.,* Ex. K. DH refused to consider the claim on the grounds that: 1) the claim had been released in the Statements and Waivers; and 2) the claim was untimely and otherwise violated the claim submission requirements of the Subcontract. *See id.,* Ex. L. RCD commenced this action five months later. RCD also continued with its work on the Project, receiving payment and executing additional Statements and Waivers in the Spring

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

of 2004. *See id.,* Ex. P.

The Statements and Waivers can certainly be read to preclude a subcontractor from subsequently asserting claims where such claims are based on work done prior to the cut-off dates set forth in the Statements and Waivers. *See Kleinknecht Electric Co. v. Jeffrey M. Brown Assoc.,* 2006 Phila. Ct. Com. Pl. LEXIS 180, 2006 WL 1005007 (Apr. 10, 2006).*See also G.R. Sponaugle & Sons, Inc. v. Hunt Constr. Group, Inc.,* 366 F.Supp.2d 236 (M.D.Pa.2004). However, in this case, there is evidence that the parties agreed separately in writing [FN3] to allow RCD's impact claims to be submitted late despite the release language in the Statements and Waivers.

> FN3. RCD also claims that DH made certain oral representations and engaged in a course of conduct that modified the Subcontract's requirements for submission of claims. "An agreement that prohibits nonwritten modification may be modified by subsequent oral agreement if the parties' conduct clearly shows the intent to waive the requirement that the amendments be in writing." *Somerset Community Hospital v. Allan B. Mitchell & Assoc., Inc.,* 454 Pa.Super. 188, 197, 685 A.2d 141, 146 (1996).*See also Universal Builders, Inc. v. Moon Motor Lodge, Inc.,* 430 Pa. 550, 560, 244 A.2d 10, 13 (1968) ("the effectiveness of a non-written modification in spite of a contract condition that modifications must be written depends upon whether enforcement of the condition is or is not barred by equitable considerations.") However, it is for the finder of fact to determine whether such an oral modification occurred. *See Somerset Community Hospital,* 454 Pa.Super. at 197, 685 A.2d at 146

> At the summary judgment stage, the court must review the alleged written modifications to determine if they do indeed modify the contract. Interpretation of the parties' written contract(s), includ-

ing any written modifications thereto, is a question of law for the court. *See Madison Const. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 606, 735 A.2d 100, 106 (1999); *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 201, 519 A.2d 385, 389 (1986).

Specifically, in February, 2003, RCD represented to DH that RCD had "been accruing cost for prior impacts to our work which will be submitted for payment during or at the conclusion of the project."*See* Response to Motion, Ex. 35. DH [FN4] acknowledged that RCD believed it "was impacted by jobsite issues and that [it would] submit same" to DH, and DH further "agreed to put these issues on the sidelines to get the project completed and [to] discuss same at the appropriate time."[FN5]*See id.,* Ex. 37. In doing so, these letters evidence an intent by the parties to modify the Subcontract's requirements with respect to the time for submission of certain of RCD's impact claims.[FN6]In addition, by agreeing that RCD may submit such claims late, DH necessarily agreed to the continued viability of RCD's existing impact claims, and thereby modified the language of release contained in the Statements and Waivers with respect to those impact claims.

> FN4. The February, 2003 letter to RCD is signed by the President of L.F. Driscoll Co. ("Driscoll"). Driscoll is one half of the DH joint venture. The President of Driscoll is not listed in the Subcontract as one of the persons authorized to modify the Subcontract in writing. *See* Motion, Ex. B, Attachment I. However, one of Driscoll's senior vice presidents is authorized, so presumably anyone above him in the corporate chain of command also has such authority. *See id.*DH, wisely, does not dispute the President's authority to issue the letter on behalf of DH.

> FN5. The parties engaged in a similar exchange of correspondence a year earlier. In March, 2002, RCD wrote to DH requesting

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 2006 WL 2009054 (Pa.Com.Pl.)

that, as a result of Project delays, "an ex-
tension of time to our contract be formal-
ized by a change order, the extended over-
head expense we have incurred be reim-
bursed and that any and all expenses asso-
ciated with accelerating our future opera-
tion to compress the schedule be paid by
[DH]."*See* Response to Motion, Ex. 16.
DH responded by letter in which it blamed
RCD for the delay and stated "we have a
long way to go to get to spring of 2003 and
it is way too early to be talking about extra
cost."*See id.,* Ex. 17.

FN6. It appears that there was sufficient
consideration for the modification, in that
RCD gave up its right to bring its existing
disruption claims at that point in exchange
for the right to bring them later. In the al-
ternative, there was apparently reliance by
RCD on the representation by DH that DH
would allow RCD to file claims late.

**\*3** The parties' letters do not make clear whether
they intended to allow late filing of only those im-
pact claims that existed at the time of the parties'
meeting in February, 2003, or if they intended to
waive the timing requirements with respect to all
other RCD impact claims as well. Since the modi-
fication of the Subcontract contained in the Febru-
ary 2003 letters is ambiguous [FN7] on this issue, the
parties may offer parol evidence at trial as to their
intentions with respect to claims for impact accru-
ing before and after February 2003. Furthermore,
with respect to those of RCD's claim that are timely
filed under any modification of the Subcontract,
DH may still prevail if, for instance, RCD is found
not to have suffered the impact damages it claims
or RCD is found to have caused its own impact
damages.

FN7."The court, as a matter of law, de-
termines the existence of an ambiguity and
interprets the contract whereas the resolu-
tion of conflicting parol evidence relevant
to what the parties intended by the ambigu-

ous provision is for the trier of
fact." *Hutchison v. Sunbeam Coal Corp.,*
513 Pa. 192, 201, 519 A.2d 385, 389 (1986).

CONCLUSION

For all the foregoing reasons, DH's Motion for Par-
tial Summary Judgment As To Released Claims is
denied.

ORDER

AND NOW, this 29th day of June, 2006, upon con-
sideration of defendant Driscoll/Hunt, a Joint Ven-
ture's Motion for Partial Summary Judgment As To
Released Claims, the response thereto, the briefs in
support and opposition, and all other matters of re-
cord, and in accordance with the Opinion issued
contemporaneously, it is hereby ORDERED that
said Motion is DENIED.

Pa.Com.Pl.,2006.
Carson/DePaul/Ramos v. Driscoll/Hunt
Not Reported in A.2d, 2006 WL 2009054
(Pa.Com.Pl.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy
Slip Copy, 2008 WL 4072591 (E.D.Pa.)

Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
KENNETH HANTMAN, INC., Plaintiff,
v.
The WHITING-TURNER CONTRACTING COM-
PANY, Defendant.
**Civil Action No. 07-1574.**

Sept. 2, 2008.

Joel M. Flink, Gordon & Weinberg PC, Consho-
hocken, PA, for Plaintiff.
George E. Rahn, Jr., Shiloh Dawn Theberge, Saul
Ewing LLP, Philadelphia, PA, for Defendant.

### *MEMORANDUM & ORDER*

SCHILLER, District Judge.
**\*1** Plaintiff Kenneth Hantman, Inc. ("Kenneth
Hantman") brings the current action against the
Whiting-Turner Contracting Company
("Whiting-Turner") for breach of contract, breach
of the implied duty of good faith and fair dealing,
and intentional misrepresentation. Defendant also
brings a counterclaim against Plaintiff for breach of
contract.

Plaintiff, a subcontractor, performed fence installa-
tion services on a project for the Navy, on which
Defendant was the contractor. During the course of
that project, Plaintiff's workers encountered prob-
lems with one of the Naval Inspectors. After the
project was complete, Plaintiff attempted to bring a
claim against the Navy to recover for the Inspect-
or's interference. However, as the contractor on the
project, Defendant had to "sponsor" Plaintiff's
claims before the Department of the Navy's dispute
resolution body. Plaintiff alleges that Whiting-Turn-
er unilaterally withdrew those claims mid-process.
Plaintiff now brings suit against Whiting-Turner to
recover what it believes should have been recouped
from the Navy.

Defendant responds, *inter alia,* that Plaintiff's
claims against the Navy were barred by contractual
releases that Plaintiff signed, waiving its right to
bring future claims against the Navy based on
events occurring during the fence-installation
project. In turn, argues Defendant, Plaintiff cannot
now bring a claim for recovery against Whiting-
Turner for what it could not have recovered against
the Navy. For the reasons discussed below, the
Court agrees with Defendant and finds that
Plaintiff's claims fail. However, Defendant's coun-
terclaim for attorneys' fees also fails.

A bench trial was held on June 17, 2008. The Court
now enters the following findings of fact and con-
clusions of law pursuant to Federal Rule of Civil
Procedure 52(a).[FN1]

> FN1. Pursuant to Local Rule of Civil Pro-
> cedure 53.2, this case was submitted to ar-
> bitration and an award was entered on
> April 24, 2008. Plaintiff timely requested a
> trial de novo. As required by Rule 53
> .2(7)(C), this Court did not allow evidence
> of the arbitration proceedings at trial nor
> did it consider the occurrence or results of
> those proceedings in rendering this Opin- ion.

### I. FINDINGS OF FACT

#### A. Background

Defendant is a general contractor involved in vari-
ous lines of construction. (*See* Parties' Joint Pre-tri-
al Stipulation Agreed Facts [hereinafter Agreed
Facts] ¶ 1.) On August 11, 2003, Defendant entered
into a subcontract with Plaintiff, a fencing corpora-
tion, for fence installations services in Philadelphia,
on a project for and owned by the United States
Navy. (*Id.* ¶¶ 2-3; Pl.'s Ex. 2 [hereinafter Subcon-
tract].) The project was known as "Perimeter Secur-
ity Fence System Naval Support Activity."(*Id.* ¶ 4.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4072591 (E.D.Pa.)

**B. Terms of the Subcontract: Releases and Claims for Additional Time**

*1. Releases*

The Subcontract included Partial Release and Final Release forms. (*See* Subcontract Article 1 & Article 11; Def.'s Ex. 2 [hereinafter Supplemental Conditions] Section V (Partial Release) & Section VI (Final Release); *see also* Subcontract Article 8(b) ("Subcontractor agrees to execute such specific releases and/or waiver of liens and lien rights as may be requested by the contractor.") The Partial Releases, which were limited in time, would be "completed each month and submitted to Whiting-Turner prior to the release of the Trade Contractor's [Kenneth Hantman] Payment."(Supplemental Conditions II (Invoice Forms and Requirements).) The Partial Release states in relevant part:

> *2 The undersigned Contractor [Kenneth Hantman, Inc.], in consideration of payments previously made and payment for the period covered by the current invoice as set forth above, hereby waives and releases ... all claims and demands against Construction Manager [Whiting-Turner], [and] Owner [the Department of the Navy] ... in any manner arising out of work, labor, services, equipment or materials performed or furnished by Contractor, its subcontractors and suppliers, in connection with the Project ... through the period covered by the current invoice and all previous invoices.

(Supplemental Conditions V (Partial Release of Lien Form) Preamble). The Partial Release form additionally required Plaintiff to affirm that it was "aware of no claims or any circumstances that could give rise to any future claims against Construction Manager [or] Owner."(*Id.* ¶ 4.) If there was a "claim or circumstance," Plaintiff was provided blank space to describe any such situation. (*Id.*)

In addition to the Partial Release, the Subcontract contained a Final Release, "to be completed and

submitted to Whiting-Turner prior to the release of the Trade Contractor's final payment."(Supplemental Conditions II.) Pursuant to that form and "in consideration of final payment" Plaintiff was to agree to:

> save harmless[ ] the Whiting-Turner Contracting Company and the above [the Department of the Navy] ... from all causes of action, suits, debts, contracts, damages, [and] judgments ... including attorneys' fees, in law, equity or otherwise, which Trade Contractor [or others] ... ever had, now have or hereafter may have against the Whiting-Turner Contracting Company or the above Owner ... from the beginning of the world to the date of this Release, in any manner relating to or arising in connection with the above referenced contract or project.

In order to "Close Out" the project, Plaintiff had to sign the Final Release. (Supplemental Conditions III (Project Close Out).)

Over the course of the project Mr. Hantman signed all of the Partial Releases, without ever listing a "claim or circumstance" that could give rise to a future claim against Whiting-Turner pr the Navy; additionally, he signed the Final Release. (*See* Pl.'s Ex. 32.) All of the forms signed were identical to the blank forms indexed in the Subcontract. (*Compare* Pl.'s Ex. 32 *with* Def.'s Ex. 2.) Plaintiff received payment in full. (Pl.'s Ex. 33; Tr. at 88-92, 94-95.)

*2. Claims for Additional Time or Compensation*

Article 6(d) ofthe Subcontract provided the following mechanism for resolving any problems that Kenneth Hantman encountered during the course of the project, or for requesting additional time or compensation associated with delays on the project:

> In the event of any dispute, controversy, or claim for additional compensation or time extensions, notice in writing shall be given to the Contractor no later than seven (7) days following the occur-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4072591 (E.D.Pa.)

Page 3

rence on which claim based.... Any claim not presented within such time period shall be deemed waived by he Subcontractor. Promptly thereafter, Subcontractor shall provide detailed information to substantiate such claim including supporting documentation and calculations and including any information requested by Contractor.

*3 (Subcontract Article 6(d).)

### C. Naval Inspector Fitzgerald

Over the course of the project, Mr. Kenneth Hantman, who shares his moniker with the company of which he is President, was involved in skirmishes with and received a number of complaints concerning Naval Inspector Charlie Fitzgerald. (*See* Pl.'s Exs. 3 (Dec. 9, 2003 Letter) & Ex. 4 (Mar. 25, 2004 Letter) & Ex. 5 (Mar. 29, 2004 Letter); June 17, 2008 Tr. at 16.) Mr. Hantman recalled at least one instance where Inspector Fitzgerald verbally assaulted him.[FN2](Tr. at 12-13; Pl.'s Ex. 3.) In another incident, Inspector Fitzgerald removed his crew in the middle of a project, leaving Mr. Hantman alone to perform a three-person job. (*Id.* at 18.)Additionally, a number of Plaintiff's workers and subcontractors reported to Mr. Hantman that they were having problems with Inspector Fitzgerald-he was yelling at them or grabbing them while they worked. (*See, e.g., Id.* at 73-74, 79; Pl.'s Exs 3, 4, 5.) Finally, Mr. Hantman also believed that Inspector Fitzgerald falsely reported to the Department of Labor that Plaintiff and/or his subcontractor was engaged in unlawful activities, a claim of which Plaintiff was later vindicated.[FN3](Tr. at 22-23.)

> FN2. Mr. Hantman testified, regarding this experience, that he was particularly upset because Inspector Fitzgerald "tendered no apology to me. And I was burned up and really-it's a very, sort of, brutal experience."(*Id.* at 13.)

> FN3. Mr. Hantman admits that Inspector Fitzgerald may have received faulty information that one of Plaintiff's subcontractors was not reporting income; according to Mr. Hantman, however, there was no veracity to any such statement.

> In a letter dated July 21, 2004, directed to the Department of Labor, Hantman describes Inspector Fitzgerald as "mentally unbalanced," or having an "illegitimate reason[ ] to simulate mental imbalance."(Pl.'s Ex. 10 (July 21, 2004 Letter).)

In response to these reports of Fitzgerald's behavior, Mr. Hantman sent three letters to Whiting-Turner, dated December 9, 2003, March 25, 2004 and March 29, 2004, reporting Inspector Fitzgerald's misconduct and seeking his removal from the project (Agreed facts ¶ 7; Pl.'s Exs. 3, 4, and 5.) The letters did not describe increased costs or delays on the project. On March 29, 2004, Whiting-Turner forwarded Mr. Hantman's letters on to the Navy-Fitzgerald's employer. (Agreed Facts ¶ 8; Pl.'s Ex. 8 Mar. 29, 2004 Cinamella Letter).) On September 19, 2004, also by way of letter, the Navy informed Whiting-Turner, who in turn informed Mr. Hantman, that they had conducted an inquiry regarding his complaints and, to the extent that they had determined that Inspector Fitzgerald was engaged in misconduct, they had pursued a course of administrative action. (Pl.'s Ex. 11 (Sept. 19, 2004 Letter); Tr. at 25-26; *see also* Def.'s Ex. 4 (Incident Report).) Mr. Hantman was interviewed as part of the investigation. (Tr. at 124.)

While the project was scheduled to take less than three months, Plaintiff took six months to complete the job. Mr. Hantman did not report any delays to the project associated with Inspector Fitzgerald's conduct. In response to inquiries by Defendant as to why Plaintiff had fallen behind schedule on the project, Plaintiff wrote two letters, which both laid out numerous reasons for the delays they were experiencing. Aside from a passing comment-"I did

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                    Page 4
Slip Copy, 2008 WL 4072591 (E.D.Pa.)

have some adversity of which you are aware"-none of the enumerated reasons included Inspector Fitzgerald's conduct. (Def.'s Ex. 7 (Dec. 26, 2003 Letter); Pl.'s Ex. 9 (April 29, 2004 Letter).) Additionally, Plaintiff did not submit a claim for additional time or compensation, resulting from the alleged acts of Inspector Fitzgerald, in accordance with Article 6(d), discussed *supra.*

**D. Plaintiff's Claim Against the Navy**

**\*4** Despite the fact that Plaintiff never earlier reported any alleged delays caused by Inspector Fitzgerald's misconduct, fifteen months after the project was complete, it decided to submit a claim against the Navy to the Department of the Navy's dispute resolution body.

In order to submit such a claim, Plaintiff first had to ask Whiting-Turner, as the general contractor on the project, to "sponsor" Plaintiff's claims. (*See* Subcontract Article 6(e).) On this issue, the Subcontract makes clear that, by sponsoring Plaintiff's claims against the Navy, Whiting-Turner would not be "acknowledg[ing] ofthe validity" ofthe claims or "waiv[ing] any right[s]." (*Id.*)

On February 23, 2006, Plaintiff initiated this process. Mr. Hantman wrote a letter to Charles Cinamella at Whiting-Turner, stating that Plaintiff sought to submit a claim against the Navy for $98,847.77 for interference caused by Inspector Fitzgerald. (*Id.*) It requested Defendant's sponsorship, but emphasized that Whiting-Turner need not take a position on the merits of the claim, nor endorse the claim in any way: "In essence, you forward the claim without comments and step aside."(*Id.*) Further, the letter reassured Whiting-Turner that Plaintiff would pay all of the costs associated with the claim, and that Plaintiff would not seek recovery against Whiting-Turner arising from the Fitzgerald incidents.[FN4](*Id.*)

> FN4. Mr. Hantman also offered to "box" Mr. Fitzgerald as an alternative means to

resolve their dispute. (Tr. at 142-43; Pl.'s Ex. 22 (Nov. 1, 2006 Email).)

On March 23, 2006, Charles Cinamella responded: "As requested, Whiting-Turner has forwarded your February 23, 2007 claim to the Department of the Navy ... Further, as stated in your February 23, 2006 letter, Kenneth S. Hantman, Inc. will bear all of its own legal costs and agrees not to seek any type of recovery from Whiting-Turner."(Pl.'s Ex. 15 (Mar. 23, 2006 Letter).) In his letter to the Navy regarding the same, Cinamella stated that "Whiting-Turner is simply forwarding this as the prime contractor and requests that any decisions or correspondence be communicated directly with Kenneth S. Hantman, Inc." (Pl.'s Ex. 16 (Mar. 23, 2006 Letter to Navy).)

The Navy's dispute resolution body failed to act on Plaintiff's claim within sixty days. (Agreed Facts ¶ 12.) Accordingly, on July 19, 2006, Plaintiff, acting *pro se,* filed a "Notice of Appeal of Deemed Denial" with the Naval Board of Contract Appeals. (Pl.'s Ex. 17 (July 19, 2006 Letter).)

While on appeal, the issue of the Partial and Final Releases came to the forefront. In October 2006, Catherine Stanton, Recorder for the Board of Contract Appeals, wrote to the parties that "A review of the ... file suggests that [Hantman] may have filed the claim after receipt of final payment, which would preclude recovery at the Board."(Pl.'s Ex. 19 (Oct. 13, 2006 Letter).) In other words, Plaintiff was required to file its claims against the Navy prior to signing the Final Release and settling his accounts. Further, Defendant's sponsorship of Plaintiff's claim became an issue. Ms. Stanton additionally wrote to the parties: "Unless and until a corporate officer of Whiting-Turner Contracting Company expressly authorizes Mr. Hantman to be a representative ... Mr. Hantman may not continue with the adjudication of the appeal."(Pl.'s Ex. 20 (Oct. 25, 2006 Letter).)

**\*5** Upon receiving word that they would have to appoint Plaintiff formally as its representative,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4072591 (E.D.Pa.)

Whiting-Turner presented Plaintiff with a Liquidation Agreement. (Pl.'s Ex. 23 (Nov. 18, 2006 Letter & Marked-Up Liquidating Agreement); Tr. at 141.) Pursuant to the terms of the Liquidating Agreement, in return for Whiting-Turner's authorization of Kenneth Hantman as its representative, Mr. Hantman was to attest that all of the claims before the Board of Contract Appeals were made in good faith. The Liquidating Agreement also reiterated that all of the risks and benefits of the claims belonged to Plaintiff. (See Pl.'s Ex. 23.)

Although the parties agreed generally on the terms of the Liquidating Agreement, there was one sticking point. Plaintiff sought to add a term requiring that Charles Cinamella, Whiting-Turner's Project Manager who was present when Mr. Hantman signed the Final Release, execute an affidavit that was "acceptable to [Kenneth Hantman]." Mr. Hantman, who was preparing to argue before the Board of Contract Appeals that the Releases were not a bar to his recovery, wanted Mr. Cinemella to state that he also did not believe that Plaintiff's claims were barred by the Releases. (See Pl.'s Ex. 27 (Dec. 11, 2006 Email) at 1.) Although Defendant was willing to supply Cinamella's affidavit, it refused to acquire Plaintiff's approval prior to execution and generally did not agree with the language of Plaintiff's proposed affidavit. (See Pl.'s Ex. 23 (Proposed Liquidating Agreement) ¶ 1(e) & Ex. 24 (Response to Marked-Up Liquidating Agreement) ¶ 1(e); Def.'s Ex. 27 (Dec. 14, 2006 8:27 Email) & 28 (Dec. 14, 2006 5:24 Email).)

Whiting-Turner wrote to the Board of Contract Appeals on December 4, 2006 that they were authorizing Plaintiff to act as their representative in the aforementioned proceedings. (Pl.'s Ex. 25 (Dec. 4, 2006 Letter.) Nonetheless, when the parties could not agree on the terms of the Cinamella affidavit, Plaintiff withdrew its claims before the Board of Contract Appeals.[FN5](Pl.'s Exs. 28 (Dec. 19, 2006 Hantman Withdrawal Letter) & 29 (Dec. 19, 2006 DeSilva Withdrawal Letter).) Furthermore, despite the fact that Plaintiff had three weeks to reinstate its

claims, it pursued no such course of conduct. (Tr. at 191; Pl.'s Ex. 31 (Dec. 26, 2006 Letter).) Rather, Plaintiff filed suit against Defendant in Pennsylvania state court, an action which was subsequently removed here.

> FN5. The parties dispute whose decision it was to withdrew the claim. Plaintiff testified that he was told by Whiting-Turner's corporate counsel, Dan China, that Defendant was withdrawing its sponsorship of Defendant's claims and, therefore, they would have to be withdrawn. (Tr. at 47, 121, 135.) Nonetheless, Mr. Hantman's testimony is contrary to the weight of the evidence. In an email dated December 14, 2006, Plaintiff wrote that, if the parties could not agree to the terms of Cinamella's Affidavit, "[t]he alternative here is *for me to suggest* that Whiting-Turner withdraw its appeals since we have failed to have reached the conditions to execute the liquidating agreement."(Pl.'s Ex. 27 at 5 (emphasis added).) Mr. Hantman went on to threaten to sue Whiting-Turner in court. (*Id.*) Mr. Hantman made the same statements in a separate email. (See Def.'s Ex. 28 (Dec. 14, 2006, 3:41 Email) (If you cannot sign the affidavit "you should notify the Board that you are withdrawing the claim and I will perforce file a claim in Maryland.").) Furthermore, Mr. China testified that it was Mr. Hantman who suggested that the claims be withdrawn. (Tr. at 155, 157.)

> Accordingly, it was only after the parties could not agree on an affidavit and at Hantman's directive that Plaintiff's claims before the Board of Contract Appeals were withdrawn. On this issue, based on the evidence received during the trial and Mr. Hantman's demeanor and testimony from the witness stand, the Court discredits Mr. Hantman's testi-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4072591 (E.D.Pa.)

mony.

## II. CONCLUSIONS OF LAW

Plaintiff brings four claims against Defendant: (1) breach of contract; (2) breach of the implied duty of good faith and fair dealing, for withdrawing Plaintiff's claim from the Board ofNavy Appeals; (3) intentional misrepresentation; and (4) breach of the implied duty of good faith and fair dealing, for "adopting and acquiescing" in Inspector Fitzgerald's conduct. Plaintiff admits that it is no longer pursuing a claim for intentional misrepresentation (or fraudulent inducement-which the substance of the claim actually alleged) and, accordingly, the Court rules in favor of Defendant on Count III. (*See* Pl.'s Mem. of Law in Opp. to Def.'s Mot. in Limine to Preclude Testimony Related to Releases at 1.)

### A. Count I: Breach of Contract

*6 Pennsylvania law governs this action. 73 PA. CONS.STAT. ANN. § 514 (2008). Under Pennsylvania Law, the essential elements for breach of contract are: "the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resultant damages." *Church v. Tentarelli,* --- A.2d ----, Civ. A. No. 07-2728, 2008 WL 2579676, at *4 (Pa.Super.2008) (*citing Pittsburgh Constr. Co. v. Griffith,* 834 A.2d 572, 580 (Pa.Super.2003), *appeal denied* 578 Pa. 701, 852 A.2d 313 (2004)).

### 1. The Releases Signed by Plaintiff Were Valid and Barred Plaintiff's Claims Against the Navy

The gist of Plaintiff's breach of contract claim is that Whiting-Turner is responsible for the damages Plaintiff allegedly incurred as a result of Fitzgerald's misconduct and Plaintiff's costs in pursuing its case against the Navy because, in Mr. Hantman's own words, Whiting-Turner "pulled the rug out from under me in terms of the agreed sponsorship."FN6(Tr. at 136.) Plaintiff's argument fails because Plaintiff executed valid releases,

which prohibited any claim against the Navy, and therefore he has not suffered "resultant damages" which could support a claim against Whiting-Turner. Plaintiff's argument also fails because Plaintiff, and not Defendant, withdrew its claim from the Board of Contract Appeals, and because, independent of the releases, Plaintiff has not proven its damages by a preponderance of the evidence.

> FN6. Recognizing Plaintiff's theory of the case, and putting aside Plaintiff's subsequent claims for breach of the implied duty of good faith and fair dealing, it is not entirely clear to the Court which express provision of the Subcontract Plaintiff alleges Defendant has breached. Plaintiff does not cite a specific provision in its Complaint or subsequent briefing. Indeed, in addition to the fatal deficiencies discussed below, Plaintiff's failure to point to a specific provision in the contract which has been breached sounds the knell for this claim.

### a. The Releases Prohibited Plaintiff's Underlying Claims Against the Navy

Under Pennsylvania law, a release is a contract. *G.R. Sponaugle & Sons v. Hunt Const. Grp.,* 366 F.Supp.2d 236, 242 (M.D.Pa.2004). As such "the effect of a release is to be determined by the ordinary meaning of its language." *Republic Ins. Co. v. Davis Sys. of Pittsburgh S., Inc.,* 543 Pa. 186, 670 A.2d 614, 615 (Pa.1995). Accordingly, if the terms of the release are clear and unambiguous, the court should look no further than the release for interpretation, even if the language is broad and general, and even if the release was improvidently entered into. *G.R. Sponaugle & Sons,* 366 F.Supp.2d at 242 (*citing Republic Ins. Co.,* 670 A.2d at 615);*see also Taylor v. Solberg,* 566 Pa. 150, 778 A.2d 664, 667 (Pa.2001).

Pennsylvania courts have long recognized the validity of contractual releases as means to settle accounts, *see Three Rivers Motor Co. v. Ford Mo-*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4072591 (E.D.Pa.)

Page 7

tor Co., 522 F.2d 885, 896 (3d Cir.1975), even where such claims which have not yet accrued. Camiolo v. State Farm Fire & Cas. Co., 334 F.3d 345, 360 (3d Cir.2003), see also Erie Ins. Co. v. Celina Mut. Ins. Co., Civ. A. No. 91-6831, 1991 WL 146953, at *4 (E.D.Pa. July 24, 1991) ("Courts applying Pennsylvania law have not hesitated to give effect to the unqualified language of a general release."), aff'd, 961 F.2d 208 (3d Cir.1992).

The terms of the releases executed between Plaintiff and Defendant are unequivocal and unequivocally apply to Plaintiff's claims against the Navy. As discussed above, the Subcontract made explicit that, in return for payments, Plaintiff would have to sign releases, and the terms of the releases were made part of the Subcontract. The Partial Releases made clear that Plaintiff released the Navy from "all claims ... in any manner arising out of work ... through the period covered by the current invoice and all previous invoices." The Partial Release also required Plaintiff to affirm that it was "aware of no claims or circumstances that could give rise to any future claims against" the Navy. In fact, the Partial Releases provided a space for Plaintiff to enumerate any "claims or circumstances" that would give rise to an action against the Navy. Despite the fact that Plaintiff was aware of and apparently subject to erratic behavior on the part of Fitzgerald as early as December 2003, he never included any mention of such events when he signed the Partial Release Forms. (See, e.g., Def.'s Exs. 11 (March 31, 2004 Executed Partial Release) & 12 (May 31, 2004 Executed Partial Release). Nor did Plaintiff make a "claim for additional compensation," which he was required to do "no later than seven (7) days following the occurrence" of the events surrounding Fitzgerald's conduct. [FN7]

> FN7. Plaintiff did submit a claim for additional compensation for materials. That claim was granted and Plaintiff was given an additional $3,600. (Def.'s Ex. 14.)

*7 The Final Release, which was also required by and included in the Subcontract, required Plaintiff

to "save harmless ... the Owner [the Navy] ... from all causes of action ... from the beginning of the world to the date of this Release, in any manner relating to or arising in connection with the above referenced contractor project." Plaintiff also signed the Final Release and received final payment.

All of the events giving rise to Plaintiff's claim against the Navy occurred prior to Plaintiff's signing of the Final Release (and, in turn, prior to multiple signed Partial Releases). Plaintiff had ample opportunity to bring a claim for additional compensation based on Fitzgerald's behavior prior to signing these releases. He did not. The releases signed by Plaintiff were clear and unequivocal and their language clearly contemplated situations such as Inspector Fitzgerald's interference. Accordingly, Plaintiff's claim against the Navy in the underlying action was barred, and his claim against Whiting-Turner, which is premised on his success against the Navy, is concomitantly barred. See, e.g., Scandale Assoc. Builders & Eng'rs, Ltd. v. Bell Justice Facilities Corp., Civ. A. No. 03-1773, 2007 WL 1074108 (M.D.Pa. Apr. 4, 2007) (unambiguous release barred delay damages).

b. The Releases Were Valid and Enforceable

Plaintiff attempts to make three arguments that the releases were not valid. First, the releases lacked consideration. Second, argues Plaintiff, at the time Plaintiff signed the Final Release, both he and Charles Cinamella both understood that the Final Release did not bar a future claim against the Navy; therefore, the parties engaged in a mutual mistake which forecloses the operation of the Final Release. Finally, Plaintiff argues that Defendant waived the release provisions by forwarding Plaintiff's claims to the Department of Navy. All of these arguments fail. The Court will discuss them in seriatim.

i. Consideration
First, Plaintiff argues that there was no consideration for the releases because, under Pennsylvania

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4072591 (E.D.Pa.)

Page 8

law, payment which one is already obligated to pay cannot amount to consideration. *See Chatham Communications, Inc. v. General Press Corp.,* 463 Pa. 292, 344 A.2d 837, 840 (Pa.1975).

Plaintiff agreed to submit the releases in the future as a condition of the original Subcontract and therefore it is supported by the same consideration as that contract. The subcontract provides first that "Subcontractor agrees to execute such specific releases and/or waiver of liens and lien rights as may be requested by the contractor."(Subcontract Article 8(b).) The subcontract incorporates its "Supplemental Conditions" as part of the "Contract Documents." (Subcontract Article 1(a) & Article 11.) The Supplemental Conditions include the Partial and Final Release Forms and explicitly state that these forms are, respectively, "to be completed each month and submitted to Whiting-Turner prior to the release of the trade contractors' " monthly and final payments. (Supplemental Conditions II, IV & V). Furthermore, signing the Final Release was a prerequisite to finalizing the project. (Supplemental Conditions III.) The releases were among the promises Plaintiff made upon entering into the contract. The consideration for the releases is the same as the consideration for Subcontract. Accordingly, no additional or independent consideration is necessary because the parties were careful to include the releases as a term of the contract. *See, e.g., Sabatoro Const. Co. v. Formosa Plastics Corp.,* Civ. A. No. 92-08-30,1996 WL 453460, at *3 (Del.Super. June 10, 1996) ("The release was clearly part of the contract and consideration existed in that contract."); *Gerald C. Wallace Co. v. Simpson Land Co.,* 281 A.2d 881 (Md.Ct.App.1973).

**\*8** Furthermore, even if the releases were considered separate and apart from the Subcontract, under Pennsylvania law "A written release or promise, hereinafter made and signed by the person releasing or promising, shall not be invalid or unenforceable for lack of consideration, if the writing also contains an additional express statement that,

*in any form of language,* that the signer intends to be legally bound."33 PA. CONS.STAT. ANN. § 6 (2008) (emphasis added). The releases clearly show an intent to be legally bound. All releases were signed before a notary and included the statement "I hereby certify, under penalty of perjury, that the information and representations set forth above are true and accurate to the best of my knowledge, information and belief."Clearly Plaintiff intended to be legally bound by the releases. Accordingly, the releases do not fail for lack of consideration.

*ii. Mutual Mistake*

Plaintiff next alleges that a mutual mistake occurred upon execution of the Final Release because both Mr. Hantman and Mr. Cinamella believed that Plaintiff would not be precluded from pursuing claims arising from Fitzgerald's conduct. A mutual mistake occurs when "both parties to a contract are mistaken as to existing facts at the time of execution." *Ford Motor Co. v. Buseman,* --- A.2d ----, 2008 WL 2637181, at *6 (Pa.Super.2008) (internal citations omitted); *see also Travelers Indem. Co. v. Ballantine,* 436 F.Supp.2d 707, 711 (M.D.Pa.2006) (applying Pennsylvania law).

First and foremost, the evidence in the record does not indicate a mutual mistake; if any mistake was made, that mistake was unilateral. Plaintiff testified that, at the time of signing the release, he did not want to give up his rights to bring a claim against the Navy. (Tr. at 33.) The evidence shows that Mr. Cinamella, who was not called to the stand, refused to sign an affidavit affirming Plaintiff's understanding.

More importantly, however, the Court will not allow Plaintiff to allege "mutual misunderstanding"-or even a unilateral mistake-of a fundamental term of the contract, where that fundamental term could not have been clearer. There was no "mistake of an existing fact." Plaintiff simply wishes to use his alleged understanding of the contract to rewrite an undesirable term. Where, as here, Plaintiff's

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4072591 (E.D.Pa.)

"understanding" stands in direct contradiction of an unequivocal term, it cannot be said that a mutual mistake existed. *See ILM Sys., Inc. v. Suffolk Constr. Co.,* 252 F.Supp.2d 151, 159 (E.D.Pa.2002) ("[A] party cannot evade the clear language of the release by contending that he did not subjectively intend to release the claim at issue."); *see also Camiolo,* 334 F.3d at 361 (*quoting Three Rivers Motor Co.,* 522 F.2d at 896 ("In interpreting a release, a court must be mindful that Pennsylvania's 'general rule ... is that the intention of the parties must govern, but this intention must be gathered from the language of the release.' ")).

### iii. Waiver

*9 Plaintiff next argues that the Defendant waived its right to rely on the releases when it presented the claim to the Navy and authorized Plaintiff as its representative to the Board of Contract Appeals. Although contractual provisions may be waived, *see Black Top Paving Co. v. Commonwealth of Pa. Dep't of Transportation,* 77 Pa.Cmwlth. 612, 466 A.2d 774, 776 (Pa.1983), a party claiming waiver must show "clear, unequivocal, and decisive action by a party with knowledge of such rights and evident purpose to surrender them." *Paramount Aviation Corp. v. Augusta,* 178 F.3d 132, 148 (3d Cir.1999). Waiver by implication requires "undisputed acts or language so inconsistent with a purpose to stand on the contract provisions as to leave no opportunity for a reasonable inference to the contrary."

The releases signed by Plaintiff have not been waived. When Plaintiff requested that Defendant forward its claim to the Department of Navy he wrote,

> [w]e agree that Whiting-Turner will, as the prime contractor, 'sponsor' the claim but will take no position on its merits. Whiting-Turner will forward the claim but does not have to endorse the claim. In essence, you forward the claim without comments and step aside. It is clear to the Navy

that the action is not instigated by Whiting-Turner but merely passed through via the formal "sponsor" process.

Furthermore, the Subcontract states: "Presentation of the claim by Contractor shall not be construed as an acknowledgment of the validity thereof *or a waiver of any right of the Contractor."*(Subcontract Article 6(e) (emphasis added).) Again, the language could not be clearer. There is simply no evidence that Defendant waived its rights to enforce the releases against Plaintiff.

### 2. Plaintiff, and not Defendant, Withdrew Plaintiff's Claims from the Board of Contract Appeals

In addition to the releases acting as a bar to Plaintiff's breach of contract claim, Plaintiff's claim also fails because it is based on Defendant's "unilateral" withdrawal of its sponsorship; the evidence presented at trial made clear that Plaintiff, and not Defendant, withdrew its own claims. (*See* Compl. ¶ 12; *see also supra* at 10.)Accordingly, in addition to the above, the facts of this case do not support Plaintiff's breach of contract claim.

### 3. Plaintiff has not proven damages

Even assuming that the releases did not bar Plaintiff's claim and that Defendant withdrew Plaintiff's claim from the Board of Contract Appeals, Plaintiff has not proven his damages by a preponderance of the evidence, and thus his contract claim fails for an additional reason. Plaintiff is claiming $144,502.05 in damages, which includes not only the alleged delays to the project associated with Inspector Fitzgerald, but also includes "attorneys' fees" for Mr. Hantman's *pro se* representation of himself before the Naval Board of Contract Appeals and for time he spent assisting his attorney at the current trial.

*10 Plaintiff did not keep a diary or logs of when Inspector Fitzgerald interfered with his workers or the amount of time delay that any such interference

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4072591 (E.D.Pa.)

caused. The three letters sent to Whiting-Turner represent the entirety of the documentation of Fitzgerald's actions. Yet Plaintiff now claims that its crew time on the project more than doubled by Fitzgerald's interference (Tr. at 102-103), and his supervisory time nearly tripled as a result of Fitzgerald's interference (Tr. at 106-107.)

Plaintiff admits that he is attributing *all* the extra time spent on the project over the original time anticipated in the bid to Fitzgerald's misconduct. When asked by the Court why all of the excess hours could be attributed to Mr. Fitzgerald's conduct, Mr. Hantman responded: "Because our crews are very uniform in their efficiency and how they perform their jobs."(Tr. at 132.) This is insufficient to establish damages. Furthermore, Plaintiff testified at trial that not all of the extra time spent was attributable to Fitzgerald:

Q: [Y]ou testified about a problem with the wall design, is that correct?

A: Yes.

Q: Mr. Fitzgerald wasn't responsible for the wall design, was he?

...

A. I know that he did not design the wall.

Q: But [Defense Exhibit 6] refers to the problem of substitution of parts in the wall, is that correct?

A: Right.

Q: And .. you're stating here that you spent $14,900 in extra man hours because of this part difference.?

A: Well, no. I'm sorry, yes. It does say that, yes....

Q: And is this time included in ... your claim?

A: I believe that any time that was a result of this

is included. Now, whether this is a correct calculation on this sheet or not, I don't know.

Q: Well, you prepared this sheet, correct?

A: I did prepare it. Its subject to error.

(Tr. at 109-110.) [FN8]Furthermore, Mr. Hantman wrote two letters to Defendant explaining the causes for delays on the project. Aside from a passing comment that Plaintiff was experiencing "some adversity" Plaintiff does not attribute *any* of the delay to Fitzgerald.[FN9]

> FN8. In an attempt to rehabilitate this testimony, on redirect, Mr. Hantman testified that Whiting-Turner somehow sanctioned the design defects in the wall and, accordingly, those are appropriate to include in damages. (Tr. at 127.)
>
> Plaintiff has not brought a claim against Whiting-Turner based on their liability for sanctioning design defects during the Project, or anything even remotely resembling that behavior. The Court will not allow Plaintiff to amend his Complaint mid-trial to attribute any such alleged conduct to Defendant.
>
> FN9. Plaintiff's method of calculating damages is consistent with the "Total Cost Method," which measures damages by subtracting a party's actual costs from its estimated costs (in this case the costs estimated by Plaintiff in his bid). The total cost method "is imprecise ... fraught with danger." *John F. Harkins Co., Inc. v. Sch. Dist. of Phila.,* 313 Pa.Super. 425, 460 A.2d 260, 263 (Pa.Super.1983). Plaintiff has not shown that all of its actual costs, over the amount estimated in its bid for the project, were caused by Fitzgerald's conduct. Therefore, to utilize the Total Cost Method in this instance would be inappropriate.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy
Slip Copy, 2008 WL 4072591 (E.D.Pa.)

Finally, with regard to the "attorneys' fees" that Plaintiff is claiming for the work he did associated with the underlying litigation or the time spent assisting his attorney in this Court, Plaintiff cites no provision in the Subcontract or principle at law that would entitle him to fees of this nature.

## B. Counts II and IV: Breach of Implied Duty of Good Faith and Fair Dealing

Plaintiff brings two claims for breach of the implied duty of good faith and fair dealing; Count II for withdrawing Plaintiff's claim from the Board of Navy Appeals and Count IV for "adopting and acquiescing" in Fitzgerald's conduct.

As a preliminary matter, "Pennsylvania law does not recognize a separate claim for breach of implied covenant of good faith and fair dealing." *Blue Mountain Mushroom Co. v. Monterey Mushroom, Inc.,* 246 F.Supp.2d 394, 400 (E.D.Pa.2000) (internal citations omitted); *see also LSI Title Agency, Inc. v. Evaluation Services Inc.,* 951 A.2d 384, 391 (Pa.Super.2008) (*citing JHE, Inc. v. Southeastern Pa. Trans. Auth.,* 2002 WL 1018941, at *6 (Pa.Com.Pl. May 17, 2002).

**\*11** However, even if this Court were to recognize Plaintiff's claim as a breach of contract action, Plaintiff has not proven the facts underlying any such claim. As discussed above, Plaintiff and not Defendant initiated the withdrawal of his claims from the Board of Contract Appeals and, therefore, Defendant cannot be said to have breached any duty to Plaintiff in that respect. Furthermore, there has been not a scintilla of credible evidence that Defendant in any way "adopted or acquiesced" in Fitzgerald's conduct. Accordingly, judgment is entered on behalf of Defendant and against Plaintiff on these counts.

## C. Defendant's Counterclaim for Breach of Contract

Defendant has raised a counterclaim for breach of

contract to recover the attorneys' fees and costs spent on the present litigation. Defendant relies on the language of the Final Release which states that Plaintiff "generally releases and agrees to indemnify and save harmless, The Whiting-Turner Contracting Company ... from all causes of action [or] suits ... [and is entitled to] awards and expenses, including attorneys' fees, in law, equity or other- wise."

Although the Final Release contemplates that it will cover an extraordinarily large period of time-"from the beginning of the world through the date of this Release"-it does not cover the time period for which Plaintiff raises his claims. As discussed above, with the exception of Plaintiff's unfounded and passing allegation that Whiting-Turner "adopted or acquiesced in" Inspector Fitzgerald's conduct, Plaintiff's claims against Whiting-Turner arise from those acts taken with respect to Plaintiff's submission of its claim to the Navy and the Contract Board of Appeals. This time period is not covered under the Final Release and, therefore, Defendant is not entitled to recover attorneys' fees and costs. Accordingly, Judgment will be entered in favor of Plaintiff and against Defendant on Defendant's Counterclaim.

## III. CONCLUSION

For the reasons discussed above, judgement as to all of Plaintiff's claims will be entered in favor of Defendant, and judgment as to Defendant's counterclaim will be entered in favor of Plaintiff. An appropriate Order follows.

### *ORDER*

**AND NOW**, this **2nd** day of **September, 2008**, upon consideration of Plaintiff's Proposed Findings of Fact and Supplemental Proposed Findings of Fact, Defendant's Proposed Findings of Fact and Supplemental Proposed Findings of Fact, following a bench trial on the merits, and for the foregoing reasons, it is hereby **ORDERED** that:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1. Judgment is entered in favor of Defendant The Whiting-Turner Contracting Company and against Plaintiff Kenneth Hantman, Inc. as to all of Plaintiff's claims.

2. Judgment is entered in favor of Plaintiff Kenneth Hantman, Inc. as to Defendant's Counterclaim.

3. Defendant's Motion in Limine to Preclude Plaintiff from Submitting Evidence of its Total Cost Damages (Document No. 31) is **DENIED as moot.**

**\*12** 4. Defendant's Motion in Limine to Preclude Testimony Related to Releases and Barred by the Parole Evidence Rule (Document No. 32) is **DENIED as moot.**[FN10]

> FN10. The Court has not allowed any parol evidence to vary the terms of the parties' unambiguous written contract. *See Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 994 (3d Cir.1987) ("[T]he parole evidence rule ... provides that when parties to a contract have reduced their agreement to writing, that writing will be the sole evidence of the agreement, and parole evidence may not be admitted to vary the terms of the contract.")

E.D.Pa.,2008.
Kenneth Hantman, Inc. v. Whiting-Turner Contracting Co.
Slip Copy, 2008 WL 4072591 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1986 WL 10547 (E.D.Pa.)
**(Cite as: 1986 WL 10547 (E.D.Pa.))**

**H**
Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
INTERMETAL MEXICANA, S.A.
v.
INSURANCE COMPANY OF NORTH AMER-
ICA.
**Civ. A. No. 84-6179.**

Sept. 17, 1986.
Morris R. Brooke, Philadelphia, Pa., for plaintiff.

Christopher P. Leise, Philadelphia, Pa., for Insur-
ance Company of North America.

MEMORANDUM

POLLAK, District Judge.

*1 This matter concerns the liability of defendant
for plaintiff's loss of eleven items of heavy equip-
ment under an insurance contract. The factual
background is summarized in my memorandum of
June 12, 1986, and need not be repeated here. On
that date, I granted defendant's motion for partial
summary judgment on the question of the extent of
defendant's liability under the contract should de-
fendant be judged liable at trial. For reasons dis-
cussed in my memorandum, I held that the unam-
biguous language of the contract made clear that
defendant's liability was limited to the replacement
cost for the lost equipment as listed in the schedule
applicable at the time the loss occurred. Plaintiff,
who has maintained that defendant is liable for the
actual replacement cost of the equipment even if
that cost is above the Replacement Cost scheduled
by the parties, has moved for reconsideration.

In the context of a discussion of the use of extrinsic
evidence to interpret ambiguous or contradictory
contract terms, plaintiff's supplemental memor-
andum on the scope of defendant's liability cited
*Atlantic Richfield v. Razumic,* **480 Pa. 366, 390
A.2d 736 (1978)** for the proposition that

"[e]vidence of course of dealing is always relevant
to the interpretation of a written contract." Plaintiff
had presented the affidavit of Stephen Heumann,
Vice President and Treasurer of IMS, the named
beneficiary of the contract at issue here, [FN1]
which described two claims made by IMS in 1984
for loss of equipment:

In May, 1984, IMS made a claim under the Policy
for the loss of a piece of equipment ... located in
Trinidad. The IMS claim was in the gross amount
of $155,095, which were IMS' full costs of repla-
cing the piece of equipment ... including freight
charges. The scheduled "Replacement Cost" in the
Policy was $153,000. CIGNA paid IMS $155,095,
less the applicable $25,000 deductible.

In August, 1984, IMS made a claim under the
Policy for the loss of a piece of equipment ... in
Venezuela. The IMS claim was in the gross
amount of $96,065. This scheduled "Replacement
Cost" in the policy was $66,726. CIGNA paid
IMS $96,065 less the applicable $25,000 deduct-
ible.

In its motion for reconsideration, plaintiff now ar-
gues that *Razumic* stands for the proposition that
course of performance is relevant to contract inter-
pretation even if the language of the contract is held
to be unambiguous. Plaintiff contends that I erred
in ruling that because the contract language is un-
ambiguous, I need not consider this evidence of
course of performance.

In *Razumic,* the Pennsylvania Supreme Court inter-
preted an agreement captioned a "DEALER
LEASE" on the basis of the writing, its riders, and
evidence of course of performance, and concluded
that the agreement in fact created a franchise. In a
footnote, the court stated:

Though our prior cases limited a court's use of
evidence of course of performance to aid interpreta-
tion to instances where the writing is ambiguous,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1986 WL 10547 (E.D.Pa.)
**(Cite as: 1986 WL 10547 (E.D.Pa.))**

see, e.g., *Maguire v. Osborne,* 384 Pa. 430, 121 A.2d 147 (1956), we agree with the draftsmen of the Restatement (Second) of Contracts that:

  *\*2* "[t]he parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning."

  Restatement (Second) of Contracts § 228 Comment g (Tent. Draft No. 5, 1970). Thus, we follow the Restatement (Second), id., Comment a, and conclude that course of performance is always relevant in interpreting a writing.

  *Razumic,* 390 A.2d at 741 n. 6.

The *Razumic* court did not hold that the language of the contract was unambiguous when viewed apart from the proffered extrinsic evidence. The footnote is thus dictum. Subsequent Pennsylvania cases that have relied on *Razumic* have also not involved the interpretation of otherwise unambiguous contracts. *See, e.g., Matt Lamb & Sons v. Christian Schmidt Brewing,* 485 A.2d 836, 840-41 (Pa.Super.1984) (course of performance indicates that letter agreement was altered, repudiated, rescinded or abandoned); *Pennsylvania Dep't of Transportation v. Westmoreland Engineering Co., Inc.,* 487 A.2d 78, 84 (Pa.Commw.1985) (dispute concerning payment for type of work not expressly referred to in contract). *See also Pennsylvania Engineering Corp. v. McGraw-Edison Co.,* 459 A.2d 329, 332 (Pa.1983) (using evidence of course of performance to further support interpretation consistent with the express terms of the agreement).

The task of a federal court in diversity is to ascertain state law. While the considered dicta of the state's highest court are to be considered, they are no more binding on federal courts than they would be on the courts of that state. 1A Moore's Federal Practice 0.307[2]. The Third Circuit has yet to consider the effect of *Razumic* on Pennsylvania law. *Cf. Brokers Title Co. v. St. Paul Fire & Marine Ins. Co.,* 610 F.2d 1174, 1178 (3d Cir.1979) (stating rule that extrinsic evidence is not to be used in in-

terpreting an unambiguous contract); *but see Mellon Bank N.A. v. Aetna Bus Credit,* 619 F.2d 1001, 1011 (3d Cir.1980) (extrinsic evidence is relevant to determining whether language is ambiguous from the perspective of the parties). Previous decisions in this district have, however, noted that *Razumic* evidences a change in the Pennsylvania parol evidence rule. *See McCormack Terminal Co., Inc. v. F.A. Potts & Co.,* CA No. 84-5091, Slip Opinion (E.D.Pa. Jan. 8, 1986) (Giles, J.); *United States Gypsum Co. v. Schiavo Bros., Inc.,* 485 F.Supp. 46, 53-54 n. 8 (E.D.Pa.1979) (Pollak, J.). As I noted in *United States Gypsum,* this change is part of the Pennsylvania Supreme Court's "renunciation of Professor Williston's position on parol evidence ... in favor of Professor Corbin's views." *Id.* at 53 n. 8. There is no reason to believe that Justice Roberts' explicit adoption of the Corbin position as expressed in the Restatement (Second) of Contracts will not exercise great force in the courts of Pennsylvania, and I follow it here as the law of the state.

This case arises in the posture of a motion for summary judgment. While plaintiff has not raised the point, the question arises as to whether the doctrine embraced in *Razumic* alters the allocation of responsibility between judge and jury once extrinsic evidence is proffered. Under the Third Circuit's reading of the Pennsylvania cases, the interpretation of an unambiguous contract is a question of law, while the interpretation of an ambiguous contract is a question for the fact-finder. *Mellon Bank, N.A. v. Aetna Business Credit,* 619 F.2d 1001, 1011 (3d Cir.1980). The Restatement approach abandons the bright-line distinction between "ambiguous" and "unambiguous" contracts. But that approach does not go so far as to require all contracts to be interpreted by the trier of fact once extrinsic evidence is introduced.

  *\*3* Section 212(2) of the Second Restatement states that "[a] question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1986 WL 10547 (E.D.Pa.)
(Cite as: 1986 WL 10547 (E.D.Pa.))

Page 3

on a choice among reasonable inferences to be drawn from extrinsic evidence. Otherwise a question of interpretation of an integrated agreement is to be determined as a question of law." Comment (e) to that provision, which deals with the evaluation of extrinsic evidence, explains that this division of labor applies regardless of whether the contract is integrated:

Even though an agreement is not integrated, or even though the meaning of an integrated agreement depends on extrinsic evidence, a question of interpretation is not left to the trier of fact where the evidence is so clear that no reasonable person would determine the issue in any way but one. But if the issue depends on evidence outside the writing, and the possible inferences are conflicting, the choice is for the trier of fact.

Similarly, as the Supreme Court recently held, the inquiry on a motion for summary judgment is "whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 106 S.Ct. 2505, 2511 (1986). *See also Bushman v. Halm,* No. 85-5289 (3d Cir. Aug. 15, 1986) (slip opinion at 10). If no reasonable inference supports the interpretation placed on the facts by the party opposing summary judgment, both Pennsylvania substantive law and federal summary judgment standards support the granting of the motion.

The approach of the Restatement (Second) of Contracts does not require that the unambiguous language of a contract be set aside whenever one party produces evidence of a contradictory course of performance. Section 203(b) of the Second Restatement provides that "express terms are given greater weight than course of performance." More particularly, the commentary to § 202(4) (course of performance) states in full:

The parties to an agreement know best what they

meant, and their action under it is often the strongest evidence of their meaning. But such "practical construction" is not conclusive of meaning. Conduct must be weighed in the light of the terms of the agreement and their possible meanings. Where it is unreasonable to interpret the contract in accordance with the course of performance, the conduct of the parties may be evidence of an agreed modification or of a waiver by one party. ... *Or there may simply be a mistake which should be corrected.*

*Id.* comment g (emphasis added). "If by mistake the parties followed a practice in violation of the terms of the agreement, the court should not perpetuate the error." *In re Chicago & E.I. Ry. Co.,* 94 F.2d 296, 300 (7th Cir.1938); *see* Restatement (Second) of Contracts § 202, illustration 13 & Reporter's Note to comment g (noting that illustration 13 is based on *In re Chicago & E.I. Ry. Co.*).

**\*4** Plaintiff claims that the course of performance demonstrates that both parties intended that it would be free to pay premiums on the basis of outdated scheduled replacement costs, but would nonetheless collect benefits on the basis of the higher replacement costs current at the time of the loss. Although the specific language of the contract and the general scheme it creates argue against plaintiff's position, I cannot conclude that no reasonable jury could interpret the contract as plaintiff contends it should be interpreted. Accordingly, an order granting plaintiff's motion to reconsider is appended.

ORDER

For the reasons stated in my Memorandum of September 16, 1986, plaintiff's motion for reconsideration is hereby GRANTED, and my Order of June 12, 1986 granting defendant's motion for partial summary judgment on the question of the extent of defendant's liability under the contract is VACATED.

FN1 The relationships among the entities

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1986 WL 10547 (E.D.Pa.)
**(Cite as: 1986 WL 10547 (E.D.Pa.))**

> involved in this matter are set forth in note
> 1 of my June 13, 1986 Memorandum.

Not Reported in F.Supp., 1986 WL 10547 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Westlaw.

Date of Printing: OCT 14,2008

## KEYCITE

**H** **Intermetal Mexicana, S.A. v. Insurance Co. of N. America, 1986 WL 10547 (E.D.Pa. Sep 17, 1986) (NO. CIV. A. 84-6179)**

### Citing References

### Court Documents

### Trial Court Documents (U.S.A.)

**Trial Motions, Memoranda and Affidavits**

> 1 KSM ASSOCIATES, INC., Plaintiff, v. ACS STATE HEALTHCARE, LLC, Defendant., 2006 WL 1358002, *1358002+ (Trial Motion, Memorandum and Affidavit) (E.D.Pa. Apr 25, 2006) **Plaintiff KSM's Associates, Inc.'s Memorandum of ...** (NO. 05-CV-4118) ★ ★

© 2008 Thomson Reuters. All rights reserved.

Westlaw

Not Reported in F.Supp.                                                                          Page 1
Not Reported in F.Supp., 1993 WL 533114 (E.D.Pa.), 39 Cont.Cas.Fed. (CCH) P 76,609

**c**

United States District Court,E.D. Pennsylvania.
UNITED STATES of America for the use and benefit of Joseph P. Sulzbach, Inc.
v.
COTTMAN MECHANICAL CONTRACTORS,
INC. and International Fidelity Insurance Co., Inc.
**No. CIV. A. 92-4378.**

Dec. 23, 1993.

MEMORANDUM

SHAPIRO
**\*1** Plaintiff Joseph P. Sulzbach, Inc. ("Sulzbach") brought this suit under the Miller Act, 40 U.S.C. § 270(a)-(d), against defendants Cottman Mechanical Contractors, Inc. ("Cottman") and International Fidelity Insurance Co. (IFIC). The dispute arises out of two contracts between Cottman and the United States Navy; Sulzbach was Cottman's electrical subcontractor. The case was tried to the court without a jury on October 19 and 20, 1993. There were two witnesses: Joseph P. Sulzbach and John (Jack) Morris. This memorandum constitutes the court's findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52.

I. FACTS

Plaintiff Joseph P. Sulzbach, Inc. ("Sulzbach"), a Pennsylvania corporation, is an electrical contractor. Defendant Cottman Mechanical Contractors, Inc. ("Cottman"), a Pennsylvania corporation, is a general contractor. Defendant International Fidelity Insurance Company (IFIC), a New Jersey business corporation that regularly conducts business in Pennsylvania by authority of the Insurance Department of the Commonwealth of Pennsylvania, is in the business *inter alia* of providing payment bonds.

Sulzbach and Cottman have worked together on contracting jobs since late 1985. Until the instant dispute, business relations between the two entities were good. Payment provisions in contracts between Sulzbach and Cottman required Sulzbach to submit invoices to Cottman no later than the twentieth day of the month for payment in the following month. However, actual terms of payment often varied from those specified in the contracts. Cottman usually made prompt payments at the beginning of any given job, but delayed or made partial payments as the job progressed.

On or about March 29, 1989 Cottman entered into a written contract, No. N62472-84-C-4744, with the United States of America, Department of the Navy ("the Navy"), for the repair of steam and condensate lines in Buildings 1, 2, and 3 at the Naval Air Development Center, Warminster, Pennsylvania, in the bid sum of $214,000 ("Condensate Contract"). On or about December 29, 1989 Cottman entered into another written contract with the Navy, No. N62472-89-C-5059, for the conversion of a portion of Building 3 at the Naval Air Station in Willow Grove, Pennsylvania to a child care center. The bid sum of this contract was $607,859 ("Child Care Project").

On April 5, 1989, Cottman, together with IFIC, duly executed and delivered a payment bond to the Navy for the protection of all persons supplying labor and material in the prosecution of the work provided for in the Condensate Contract; such bond was executed in accordance with the Miller Act, 40 U.S.C. § 270(a)-(f), in the sum of $107,000. On or about January 8, 1990, Cottman, together with IFIC, duly executed and delivered another payment bond to the Navy for the protection of all persons supplying labor and material in the prosecution of the work provided for in the Child Care Project; such bond was also executed in accordance with the Miller Act, in the sum of $303,929.50.

**\*2** On or about April 11, 1989, Cottman entered into a contract with Sulzbach, providing that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 533114 (E.D.Pa.), 39 Cont.Cas.Fed. (CCH) P 76,609

Sulzbach would supply and install all necessary labor, material and/or equipment for all electrical work on the Condensate Contract for a consideration of $37,000. Sulzbach commenced work on the Condensate Contract in the spring of 1989, and submitted an initial invoice for the work in May, 1989. (Plaintiff's Exh. 7). After that invoice, work on the contract was delayed through no fault of Sulzbach so that Sulzbach did not submit another invoice to Cottman until November, 1989. *Id.* By November, 1989, Sulzbach had billed Cottman for approximately $20,000 of the $37,000 contract; Cottman had not contested the billing, and had paid most of the sum.

The project was delayed again, and Sulzbach shut down, or demobilized, the project twice. Sulzbach incurred costs associated with demobilization, and with remobilizing after the shutdowns. By late 1990, the project was approximately 99% complete. (Plaintiff's Exh. 7). The Sulzbach portion of work remaining on the Condensate Contract included completing punch list items and testing pumps that Sulzbach had installed. Sulzbach estimated the balance to finish to be $392; Sulzbach did not bill Cottman for this balance. The last day that Sulzbach had people working on the Condensate job was in early 1992. To date, Cottman has paid Sulzbach the sum of $21,000 on the Condensate Contract. There is a contract balance due Sulzbach on the Condensate Contract in the amount of $15,608.

On or about January 25, 1990, Cottman contracted with Sulzbach to supply and install all necessary labor, material, and/or equipment for electrical work on the Child Care Project for $88,000. During the course of performance on the Child Care Project, there was an agreed-upon increase in the contract price in the amount of $56,847.43. (Plaintiff's Exh. 5). Sulzbach began work on the Child Care Project in early 1990. However, like the Condensate Contract, work on the Child Care Project was delayed without fault of Sulzbach, and there were time periods when Sulzbach did not perform any work.

In December, 1991, Sulzbach ceased work on the Child Care Project; Mr. Sulzbach testified that Sulzbach could not continue work because of other unfinished work that needed to be complete before the electrical work could proceed. Sulzbach returned to the job site in February, 1992; at this time, Sulzbach performed some work but did not complete all work required under the contract. After February, 1992, Sulzbach did not return to the job site; Cottman threw Sulzbach off the job site at that time.

To date, Cottman has paid Sulzbach the sum of $97,302 on the Child Care Project. There is a contract balance due Sulzbach on the Child Care Project in the amount of $47,545.43.

## DISCUSSION

The parties have stipulated that there is a contract balance due Sulzbach totalling $63,153.43 on the Condensate and Child Care contracts. Sulzbach argues that it is entitled to the full balance due, plus expenses incurred because of Cottman's delay on the project, and interest on the claim. Cottman argues that because Sulzbach materially breached the contract, it is not entitled to compensation. Cottman also asserts several counterclaims. The parties agree that the issue is whether Sulzbach materially breached the contract or substantially performed its obligations.

### I. Sulzbach's Case in Chief

### A. Breach of Contract

*3 It is undisputed that Sulzbach and Cottman contracted for Sulzbach to perform the electrical work on the Condensate and Child Care contracts for a certain price. Sulzbach claims to have substantially completed the work on both contracts; Cottman disputes this contention.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 533114 (E.D.Pa.), 39 Cont.Cas.Fed. (CCH) P 76,609

1. Condensate Contract

In January, 1991, Sulzbach submitted an invoice to Cottman, billing for $36,608 of the $37,000 price. At that time,

Sulzbach had not yet completed the punch list items, as-built drawings, or final testing on the pumps. To date, Sulzbach has not completed these items. The parties dispute whether Sulzbach fulfilled its contractual obligations regarding the Delta System and the variable speed drives. Sulzbach never billed Cottman for the $392 balance.

Cottman argues that Sulzbach breached the contract by failing to complete its obligations. "Although any contractual default may be considered a breach, it is only when the breach constitutes a material failure that the nonbreaching party is discharged from all further obligations under the contract and is free to terminate the contract." *Tyro Indus., Inc. v. Trevose Constr. Co., Inc..* 737 F.Supp. 856, 864 (E.D.Pa.1990) (citations omitted).

Under Pennsylvania law, the following five factors are considered in determining whether a breach is material: (a) extent to which the injured party will be deprived of the expected benefit; (b) extent to which injured party can be adequately compensated for the part of the benefit of which he was deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) likelihood that the party failing to perform will cure his failure; (e) extent to which the behavior of the party failing to perform or to offer to perform comports with standard of good faith and fair dealing. *Id.* at 865.

Mr. Sulzbach testified that Sulzbach completed almost all required work on the Condensate Contract. Further, he testified that the $392 balance not billed on the Condensate Contract fairly represented the value of the work not done. Mr. Sulzbach's testimony on this subject was more credible than Mr. Morris'. Although Sulzbach did not fulfill all contractual requirements, it did not materially breach;

the $392 balance that Sulzbach never billed fairly represents the value of the work not performed by Sulzbach. Accordingly, Sulzbach is entitled to recover the $15,608 billed and due on the Condensate Contract.

2. Child Care Project

In December, 1991, Sulzbach billed Cottman for the work performed to date on the Child Care project. Although Sulzbach had performed substantial work on the contract until that time, in December Sulzbach was unable to continue because other aspects of the job were not sufficiently complete to allow Sulzbach to perform the electrical work. Sulzbach could not complete work on the fume hood system, fire alarm system, setting of the range, ceiling in isolation closet, or the recirculating pump. (Defendant's Exh. 27; Defendant's Exh. 28). In February, 1992, Sulzbach returned to the job site. At this time, Sulzbach installed lighting fixtures and heat detectors, checked wiring, connected some kitchen equipment, and worked on the recirculating pump. Sulzbach never completed the setting of the range, fume hood system, or the fire alarm system. In late February or early March, Cottman threw Sulzbach off the job site; since that time, Sulzbach has not returned to work on the project.

*4 Sulzbach established by a preponderance of the evidence that its failure to complete the electrical work required under the contract was due to delay on the part of Cottman in preparing the job site. Sulzbach could not complete some tasks on the Child Care project until Cottman performed certain preliminary work. Although Cottman argues that as of December, 1991, Sulzbach could have completed its contractual obligations within four weeks, the weight of the evidence is otherwise. Sulzbach notified Cottman in December, 1991 that it needed information from Cottman and the Navy before continuing to perform electrical work. Cottman responded that, for certain matters, they were awaiting an answer from the Navy and would notify Sulzbach

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 533114 (E.D.Pa.), 39 Cont.Cas.Fed. (CCH) P 76,609

when it was received. (Defendant's Exh. 27; Defendant's Exh. 28). Cottman never forwarded information from the Navy to Sulzbach regarding these matters, and Sulzbach never completed these tasks.

This court finds that the delay in completion of Sulzbach's tasks was primarily not the fault of Sulzbach. Sulzbach completed the work that could be completed. When Sulzbach learned that Cottman had in fact recovered almost full payment from the Navy, despite the fact that Cottman informed Sulzbach that the Navy held all of the money, it demanded payment under the contract. Cottman then threw Sulzbach off the job site. Sulzbach did not materially breach the contract, and therefore is entitled to recover payment under the contract. There is a contract balance due Sulzbach on the Child Care Project in the amount of $47,545.43. However, Cottman is entitled to set off amounts paid by Cottman to another subcontractor hired to perform tasks left incomplete by Sulzbach. The amount of the setoff to which Cottman is entitled will be considered below, in connection with Cottman's counterclaims.

B. Delay Claims

Sulzbach asserts entitlement to compensation for costs incurred by delay on the Condensate and Child Care contracts. The Third Circuit has not ruled on whether delay claims are recoverable from a contractor or its surety under the Miller Act. The Courts of Appeals for other circuits have held that subcontractors can recover the out-of-pocket costs of delay from a Miller Act surety. See United States for use of Lochridge-Priest, Inc. v. Con-Real Support Group, Inc., 950 F.2d 284, 287 (5th Cir.1992); United States for use of T.M.S. Mechanical Contractors, Inc. v. Millers Mutual Fire Ins. Co. of Texas, 942 F.2d 946, 953 (5th Cir.1991); United States for use of Pertun Constr. Co. v. Harvesters Group, Inc., 918 F.2d 915, 918 (11th Cir.1990); United States for use of Heller Electric Co., Inc. v. Klingensmith, Inc., 670 F.2d 1227,

1230-31 (D.C.Cir.1982).

Payment bonds under the Miller Act protect suppliers of labor and materials to government construction projects by permitting the supplier to sue the surety on the payment bond. The purpose of the statute can only be achieved by permitting a subcontractor to recover for all costs of labor and material supplied in performing under the contract, including amounts incurred because of delay. See Millers Mutual, 942 F.2d at 949, 951. This court adopts the interpretation of the Miller Act of the above-cited cases, and holds that out-of-pocket costs of delay are recoverable.

1. Condensate Contract

*5 Sulzbach asserts that its progress on the Condensate Contract was delayed for a cumulative period in excess of 159 days. Sulzbach further asserts that its costs and expenses associated with 159 delay days equal $15,911. Sulzbach bases its delay claim upon the costs of demobilizing and remobilizing for work on the project, as well as indirect costs such as failing to absorb the overhead assigned to the project. Sulzbach asserts that it had an agreement with Cottman that Sulzbach would be compensated for the same number of delay days for which the Navy compensated Cottman; the Navy ultimately recognized Cottman's expenses associated with 159 days of delay. But Cottman acted only to transmit information from the Navy to Sulzbach regarding the Navy's procedures for delay claims. Sulzbach has not met its burden of proving the existence of an agreement between Sulzbach and Cottman regarding compensation for delay.

Under the Miller Act, Sulzbach is entitled to recover the direct costs incurred because of the delay; Sulzbach cannot recover lost profits or overhead. After reviewing the record, the court finds that Sulzbach incurred out-of-pocket costs related to demobilization, remobilization, and increased wages in the amount of $2,724. Sulzbach is entitled to recover that amount.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 533114 (E.D.Pa.), 39 Cont.Cas.Fed. (CCH) P 76,609

### 2. Child Care Project

Sulzbach asserts that progress on the Child Care Project was also delayed, and that Sulzbach incurred costs and expenses associated with the delay in the amount of $24,207. The delay costs included demobilization and remobilization, labor, fringe benefits, taxes and insurance, home office and extended overhead, and profit. (Plaintiff's Exh. 25). Sulzbach asserts that the parties had an agreement regarding compensation for delay that Sulzbach would be compensated for the same number of delay days that the Navy allowed Cottman. Ultimately, the Navy compensated Cottman for 216 days of delay. However, as with regard to the Condensate Contract, Sulzbach has not met its burden of proving the existence of an agreement between Sulzbach and Cottman regarding delay. In the absence of proof that Cottman agreed to compensate Sulzbach for the number of delay days for which Cottman itself was compensated, Sulzbach cannot recover all the delay costs that it claims.

As with the Condensate Contract, Sulzbach can recover direct out-of-pocket costs associated with the delay. After reviewing the record, the court concludes that Sulzbach's direct costs caused by the delay were associated with demobilization, remobilization, and increased wages. These costs amounted to $2,000 for the Child Care Project.

### C. Prejudgment Interest

Sulzbach claims entitlement to prejudgment interest, as damages for the delay in payment. Whether prejudgment interest should be awarded on a Miller Act claim is a matter of federal law. *See F.D. Rich Co. v. U.S. for the use of Indus. Lumber Co., Inc.,* 417 U.S. 116, 127 (1974) (scope of remedy and substance of rights under Miller Act is matter of federal law.) However, the Miller Act does not provide explicit standards for an award of prejudgment interest. Federal courts must incorporate pertinent state law on this issue. *United States for use of Treat Brothers Co. v. Fidelity and Deposit*

*Co. of Maryland,* 986 F.2d 1110, n. 9 (7th Cir.1993); *United States for use of Lochridge-Priest, Inc. v. Con-Real Support Group, Inc.,* 950 F.2d 284, 287 (5th Cir.1992); *United States for use of Yonker Constr. Co. v. Concrete Industries,* 935 F.2d 936 (8th Cir.1991).

*\*6 Under Pennsylvania law, prejudgment interest in a contract action may be recovered if:

(1) a defendant commits a breach of a contract to pay a definite sum of money; or (2) a defendant commits a breach of contract to render a performance the value of which in money is stated in the contract; or (3) a defendant commits a breach of contract to render a performance the value of which is ascertainable by mathematical calculation from a standard fixed in the contract; or (4) a defendant commits a breach of a contract to render a performance the value of which in money is ascertainable from established market prices of the subject matter.

*Black Gold Coal Corp. v. Shawville Coal Co.,* 730 F.2d 941 (3d Cir.1984). Prejudgment interest is a matter of right in contract actions when liquidated sums are involved. *Id.; see*

*Fernandez v. Levin,* 548 A.2d 1191, 1193 (Pa.1988) ("the award of interest in a contract action is a matter of right regardless of when it is demanded.")

The amount that Cottman owed to Sulzbach was specified in the contracts. Sulzbach submitted invoices for the amounts due; the amount of the debt was readily ascertainable. The contract damages involve liquidated sums, so Sulzbach is entitled to receive prejudgment interest under Pennsylvania law.FN1

The right to interest commences at the time payment is withheld after it has been the duty of the debtor to make such payment. *Fernandez v. Levin,* 548 A.2d 1191, 1193 (Pa.1988). Sulzbach submitted an invoice for $36,608 on the Condensate Con-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 533114 (E.D.Pa.), 39 Cont.Cas.Fed. (CCH) P 76,609

Page 6

tract dated January 10, 1991 for work performed through December 30, 1990. (Plaintiff's Exh. 7.) Although Sulzbach's actual last day on the job was not until early 1992, it has not billed for any work performed after the January 10, 1991 invoice. Under the contract terms, Sulzbach was to submit invoices by the twentieth day of the month for payment in the following month. Sulzbach was entitled to payment in February, 1991; prejudgment interest will run from February 28, 1991.

The last invoice submitted on the Child Care Project was for work performed through February 29, 1992. (Plaintiff's Exh. 6).

Although this invoice billed for the complete contract price, Mr. Sulzbach testified that the job was not 100% complete at that time; Sulzbach was billing in advance for incomplete work. Sulzbach was thrown off the job site in late February, 1992. Since the contract terms provide for payment in the month following an invoice, prejudgment interest on the amount due on the Child Care Project will run from March 31, 1992.

Pennsylvania law provides that simple interest at the statutory rate should be added to the damages due Sulzbach under the contracts. Sulzbach argues that the interest should be assessed at the federal interest rate set by the Department of Treasury. According to Sulzbach, both contracts between the Navy and Cottman provide that the contract interest rate will be the federal rate. This provision was not included in the contracts between Sulzbach and Cottman, but their subcontracts include a clause incorporating the terms of the primary contract. Sulzbach argues that the contract provision selecting the federal rate is incorporated into the subcontracts between itself and Cottman.

**\*7** Sulzbach does not identify the contract provision in the Navy-Cottman contracts specifying the federal interest rate. The court assumes that Sulzbach is referring to the section entitled "Clauses Incorporated by Reference." This clause provides, "This contract incorporates the following clauses by ref-

erence, with the same force and effect as if they were given full text. Upon request, the Contracting Officer will make their full text available." The clause lists approximately sixty (60) Federal

Acquisition Regulation Clauses (48 C.F.R. ch. 1). The fortieth item listed provides, "FAR 52.232-17, Interest (APR 1984)." Federal Acquisition Regulation 52.232-17 provides that the applicable interest rate shall be the rate established by the Department of Treasury.

Neither contract between Sulzbach and Cottman provides an applicable interest rate; Sulzbach argues that their subcontracts contain a conduit clause incorporating the terms of the primary contract. Again, Sulzbach does not specify the clause to which it refers. The court has examined the Condensate and Child Care Purchase Orders marked as Plaintiff's Exhibits 1 and 2, and cannot identify a common provision that could be termed a conduit clause. The Sulzbach-Cottman Condensate Contract provides, "[a]ll work will be in complete accordance with all the plans, specifications, and general conditions for this project as prepared by Wagner Associates and the U.S. Navy."The Sulzbach-Cottman Child Care Contract provides, "[t]his contract is subject to all terms and conditions in contract # 89C-5059 between Cottman Mechanical Contractors Inc. and the U.S. Navy."

The clause in the Condensate Contract does not provide that all terms of the primary contract are incorporated into the subcontract; Sulzbach's claim that the federal interest rate applies to prejudgment interest on this contract is rejected. While the clause in the Sulzbach-Cottman Child Care Contract is broader, the court concludes that it does not require that the federal rate apply to the damages awarded to Sulzbach.

Plaintiff relies on *John F. Harkins Co., Inc. v. Waldinger Corp.,* 796 F.2d 657 (3d Cir.1986), *cert. denied, TWC Holdings. Inc. v. John F. Harkins Co.. Inc.,* 479 U.S. 1059 (1987). In the *Harkins* case, the issue was whether a subcontract provision

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 533114 (E.D.Pa.), 39 Cont.Cas.Fed. (CCH) P 76,609

binding the subcontractor to applicable provisions of the primary contract limited the scope of the subcontract's arbitration provision to the narrower provision contained in the primary contract; the conduit clause provided, "subcontractor shall be bound by all provisions of these documents and also by applicable provisions of the principal contract to which the contractor is bound, and to the same extent." *Id.* at 660. The *Harkins* district court considered this contract clause and an affidavit stating that the intent of the clause was to insure that subcontractors had no greater rights or remedies against the prime contractor than the prime contractor had against owners or general contractors under principal contracts. *Id.* at 661. It concluded that the conduit clause in that contract did limit the subcontractor's rights to those provided in the primary contract, and the Court of Appeals affirmed the district court's contract interpretation as not clearly erroneous.

**\*8** The *Harkins* case does not require that the federal interest rate be applied in this case. Unlike the parties in *Harkins,* Sulzbach has not submitted any evidence that the parties intended the interest provision of the Cottman-Navy contract to apply to the Sulzbach-Cottman subcontract. Here, the interest provision is not explicit in the primary contract, but is merely incorporated by reference to the Federal Acquisition Regulations. The court sees no reason to deviate from established practice under the Miller Act; pertinent state law determines the rate of prejudgment interest. The Pennsylvania statutory rate is 6%.

II. Cottman's Counterclaims

A. Costs of Completion

Cottman asserts several bases for recovery or set off against Sulzbach. These claims include sums of money owed by Sulzbach to other contractors, and sums expended by Cottman to complete the contractual work.

Cottman counterclaims for approximately $11,000 owed by Sulzbach to subcontractors Cerberus Pyrotronics and Snyder-Deacon Painting. Cottman has not actually paid the subcontractors the amount due from Sulzbach, nor has it promised to pay the debts in the future. Instead, Cottman has simply promised the subcontractors that it will attempt to get Sulzbach to pay the amounts due. Unless Cottman is legally obligated to compensate Cerberus Pyrotronics and Snyder-Deacon if Sulzbach fails to do so, there can be no set-off for the amounts allegedly owed by Sulzbach.

Cottman also counterclaims for amounts paid Frater's Electric to finish the work that Sulzbach left incomplete. Although Cottman's counterclaim demands approximately $13,359, Cottman paid Frater's Electric only $8,279.90. (Defendant's Exhs. 49-50). Since Sulzbach did not complete its contractual obligations, Cottman is entitled to set off the amount paid to another subcontractor to finish the job. Although Sulzbach disputed that Frater's charges were fair and reasonable, it presented only Joseph Sulzbach's bare assertions that the charges and time spent were "outlandish", and that Frater billed for work that Sulzbach actually did. In light of Frater's Electric's documented charges, this court finds that Cottman is entitled to recover the $8,279.90 actually paid to Frater's Electric to complete the electrical work.

B. Delay Claims

Cottman also seeks compensation for (1) the costs of supervising the Child Care Project for 72 days of delay when Sulzbach was not on the job; and (2) the 72-day reduction of Cottman's delay claim against the Navy.

Cottman claims entitlement to $31,362 as the direct cost of supervising the Child Care Project during 72 days of delay caused by Sulzbach. Cottman employee George McCue supervised the project during a period from November, 1991 through February, 1992 when Sulzbach was absent; Cottman

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 533114 (E.D.Pa.), 39 Cont.Cas.Fed. (CCH) P 76,609

seeks compensation at McCue's hourly rate for 72 eight-hour days, plus overhead and profit. However, Cottman failed to establish that Sulzbach caused the 72-day delay, or that the job site was ready for Sulzbach to continue work on the contract during this period. The weight of the evidence supports the proposition that the delay was due, at least in part, to Cottman's actions. Cottman also failed to prove that no work was performed during the 72 days; if Cottman performed work during the period, it cannot recover the portion of McCue's salary attributable to the work performed. Since Cottman failed to prove that it supervised the project for 72 days of delay *caused by Sulzbach*, it cannot recover the cost of supervision from Sulzbach.

*9 Cottman also claims $24,037.36, the amount by which the Navy reduced Cottman's delay claim regarding the Child Care Project. Cottman sought compensation for delay on the Child Care Project from the Navy; Cottman alleges that the Navy reduced Cottman's delay claim by 72 days at a rate of approximately $333 per day. Cottman further alleges that the Navy reduced the claim because of Sulzbach's failure to complete the contract. Accordingly, Cottman seeks compensation from Sulzbach for the Navy's reduction. However, the reasons given by the Navy for its decision to reduce Cottman's delay claim are not binding on the court; Sulzbach was not a party to the negotiations with the Navy. Cottman did not sustain its burden of proving that the 72 days of delay were due to Sulzbach's inaction or failure to complete the contract. Since Cottman failed to prove that the Navy's reduction in compensation for delay was attributable to Sulzbach, it cannot recover the sum claimed as damages from Sulzbach.

C. Miscellaneous

Cottman also counterclaims for damages for various claims and consulting work allegedly performed by Cottman for Sulzbach in relation to litigation with the United States Armed Forces Board.

Certain claims totalling $11,837.59 are listed in Exhibit B attached to the Amended Counterclaim; they include *inter alia:* charges for tools borrowed in 1989, for inadequate or nonexistent equipment, and an overpayment on a change order. Cottman failed to prove that the charges listed were reasonable and recoverable against Sulzbach. The court finds that Mr. Morris' testimony regarding these claims was not credible; Cottman failed to sustain its burden of proof on these counterclaims. Moreover, these claims were not specifically asserted until the Amended Counterclaim was filed on March 3, 1993. Several of the claims apparently arose in 1988 or early 1989; these claims are barred by the four-year statute of limitations.

Cottman also claims $16,500 for consulting work on behalf of Sulzbach in connection with litigation with the United States Armed Forces Board. According to Defendants' Exhibit 70, Cottman charged Sulzbach legal fees for presenting Sulzbach's electrical change order # 24 case through trial with the Armed Forces Board and appeal by the Navy. Cottman billed for 110 hours of Jack Morris' time at $150 per hour in preparation and presentation of the case. Cottman alleges that this charge is in accordance with an oral agreement between Cottman and Sulzbach. Sulzbach denies that any such agreement existed; Mr. Sulzbach testified that Cottman was involved in that litigation because of its own interest, not as a paid representative of Sulzbach. The court finds Mr. Sulzbach's testimony more credible; Cottman failed to meet its burden of proving that Sulzbach agreed to compensate Cottman for representation in the change order litigation.

The Amended Counterclaim also asserted entitlement to $25,000 for liquidated damages assessed against Cottman by the Navy; Cottman withdrew this counterclaim prior to trial.

CONCLUSIONS OF LAW

*10 1. This court has jurisdiction under the Miller Act, 40 U.S.C. § 270(a)-(f).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 533114 (E.D.Pa.), 39 Cont.Cas.Fed. (CCH) P 76,609

2. Venue is proper in this court in that this suit is being brought in the District where the project is located.

3. The bond executed and delivered by Cottman, together with IFIC, for the Condensate Contract was done so in accordance with the Miller Act.

4. The bond executed and delivered by Cottman, together with IFIC, for the Child Care Project was done so in accordance with the Miller Act.

5. Sulzbach did not materially breach the Condensate Contract.

6. Sulzbach is entitled to recover the $15,608 balance due on the Condensate Contract.

7. Sulzbach did not materially breach the Child Care Project.

8. Sulzbach is entitled to recover $39,265.53 on the Child Care Project, the amount due less the $8,279.90 that Cottman paid to Frater's Electric.

9. Sulzbach is entitled to recover $2,724 for direct costs of delay on the Condensate Contract.

10. Sulzbach is entitled to recover $2,000 for direct costs of delay on the Child Care Project.

11. Sulzbach is entitled to recover prejudgment interest at the Pennsylvania statutory rate.

12. Cottman cannot recover delay damages from Sulzbach.

13. Cottman cannot recover for the various contractual claims unrelated to the Condensate or Child Care contracts.

14. Sulzbach and Cottman did not have a contract for consulting work to be performed by Cottman for Sulzbach.

ORDER

AND NOW, this day of December 1993, it is

ORDERED that:

1. Judgment is entered for United States of America for the use and benefit of Joseph P. Sulzbach, Inc. and against Cottman Mechanical Contractors, Inc. and International Fidelity Insurance Co. in the amount of:

a) $18,332 ($15,608 plus $2,724 for direct costs of delay) on the Condensate Contract, with prejudgment interest at 6% from February 28, 1991; plus

b) $41,265.53 ($39,265.53 plus $2,000 for direct costs of delay) on the Child Care Project, with prejudgment interest at 6% from March 31, 1992.

2. Judgment is entered for United States of America for the use and benefit of Joseph P. Sulzbach, Inc. and against Cottman Mechanical Contractors, Inc. on the Amended Counterclaim.

> FN1. Awarding delay damages under the Miller Act and prejudgment interest is not overcompensatory, even though Pennsylvania law characterizes prejudgment interest as compensation for delay in payment. Delay damages under the Miller Act are for out-of-pocket expenses, while prejudgment interest compensates for the time value of money.

E.D.Pa. 1993
U.S. For Use and Ben. of Joseph P. Sulzbach, Inc. v. Cottman Mechanical Contractors, Inc.
Not Reported in F.Supp., 1993 WL 533114 (E.D.Pa.), 39 Cont.Cas.Fed. (CCH) P 76,609

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.