IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA FOR THE      :
USE OF PIONEER CONSTRUCTION CO.       :
INC.                                  :
        Plaintiff              :
                                       :
       v.                            :          3:CV-07-0994
                                       :          (JUDGE VANASKIE)
PRIDE ENTERPRISES, INC.,              :
GREAT AMERICAN INSURANCE CO.          :
        Defendants             :

MEMORANDUM

      This action was brought pursuant to the Miller Act in the name of the United States of

America for the use of Pioneer Construction Company, Inc. ("Pioneer"), against Pride

Enterprises, Inc. ("Pride"), Jeffrey M. Brown Associates, Inc. ("Brown"), and Pride's surety,

Great American Insurance Company ("Great American").   Pioneer seeks monies owed

pursuant to a subcontract entered into between Pioneer and Defendants for construction and

improvement of a National Park site, including damages for Defendants' failure to pay for work

performed, failure to pay equitable adjustments to the subcontract, and failure to pay additional

costs incurred as a result of delays in work.  Currently pending before the Court are

Defendants' Motion for Summary Judgment (Dkt. 38), and Motion to Deem Certain Request for

Admission as Admitted (Dkt. 35).[1]  Because, contrary to Defendants' argument, Pioneer's claim

_____

     [1]  For the convenience of the reader of this Memorandum opinion in electronic format,
hyperlinks to the Court's record and to authority cited herein have been inserted.  The Court

is not barred by partial releases and Miller Act sureties may be held liable for delay damages, Defendants' Motion for Summary Judgment will be denied.  Furthermore, as Plaintiff has admitted that the events causing delay occurred before December 5, 2005, Defendants' Motion to Deem Certain Request for Admission as Admitted will be granted.

I.  BACKGROUND

Defendant Pride is a "Small Business Administration 8(a)-certified general contractor." (Defendants' Statement of Undisputed Material Facts ("DSUMF"), Dkt. 39, at ¶ 1.)  "In 2003, Pride was awarded a prime contract by the U.S. National Park Services ("NPS") for construction and site improvements at the Grey Towers National Historic Landmark in Pike County, Pennsylvania ("the Project")."  (Id. at ¶ 2.)  Pride and Defendant Brown entered into a "Teaming Agreement" on August 1, 2003, to "provide the necessary resources and expertise, as required by [Pride], to enable [Pride] to perform [the Project]." (Teaming Agreement, Dkt. 38-15, at 17.)  Defendant Great American acted as surety, providing "a payment bond to Pride in connection with the Project." (DSUMF, Dkt. 39, at ¶ 4.)  Pursuant to a February 11, 2004 Subcontract (the "Subcontract"), Pride contracted with Pioneer to perform specific work on the

---

accepts no responsibility for, and does not endorse, any product, organization, or content at any hyperlinked site, or at any site to which that site might be linked.  The Court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court. Citations to page numbers refer to the page number of the document on the CM/ECF electronic record.

Project.  (Subcontract, Dkt. 38-8, at 1.)

Article 2.3 of the Subcontract provided:

The Subcontractor, as a condition precedent to the Contractor making any partial or final payment hereunder, shall furnish to the Contractor a full and complete release and discharge, on the forms attached hereto as Schedules D and E, of all liens, claims and demands arising out of or relating to the Subcontract Work and any and all materials furnished, work done and equipment used in connection therewith.

(Id. at 3.)  Plaintiff claims that when it executed the Subcontract, Schedules D and E were not attached.[2]  (Plaintiff's Statement of Undisputed Material Fact ("PSUMF"), Dkt. 42, at ¶ 6.)

---

[2] In support of this assertion, Plaintiff cites the Declaration of Robert Jenkins.  Paragraph three of Jenkins' Declaration states:

I have read the entirety of Plaintiff's Statement of Material Facts In Opposition to Defendants' Motion For Summary Judgment and all of the facts stated and matters described therein are true and correct to the best of my personal knowledge, information and belief.  In particular, I am making this declaration as to the truth and accuracy of the statements set forth and the documents referenced at ¶¶ 6, 8, 9, 10, 11, 16, 20, 24 and 25.

(Jenkins Declaration, Dkt. 43, at ¶ 3.) Federal Rule of Civil Procedure 56(e)(1) provides that "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.  If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit." Fed. R. Civ. P. 56(e)(1).  A certified copy of the statement of material facts is not attached to Jenkins' Declaration.  Plaintiff avers that the Declaration is sufficient as "it would only serve to further impose on the Court's time and resources to repeat verbatim in the Jenkins Declaration all of the facts stated and documents referenced in the identified particular paragraphs of plaintiff's Rule 56.1 Statement to which Jenkins attests." (Dkt. 58, at 16.)  Plaintiff's Declaration does not comport with the requirements of Federal Rule 56(e)(1), and consequently will not be considered as supporting Plaintiff's opposition to the summary judgment motion.  Instead, the exhibits submitted by the parties will

3

"Pioneer submitted periodic Applications and Certificates for Payment ("Payment Applications" or "Requisitions") to Pride during the Project . . . ." (DSUMF, Dkt. 39, at ¶ 8.)  The first Payment Application covered the period from the start of the project until February 29, 2004 (Pay. App. #1, Dkt. 38-9, at 1), and the final Payment Application covered the work period ending April 29, 2006. (PSUMF, Dkt. 42, at ¶ 8.)

There is a dispute as to how the parties administered Article 2.3 of the Subcontract. Pioneer claims that it was paid pursuant to the first three Payment Applications without submitting a release of claims as required by Article 2.3 of the Subcontract.  (PSUMF, Dkt. 42, at ¶ 9.)  Pioneer avers that

> Prior to July 12, 2004, neither Pride nor Brown had provided Pioneer with the form 'partial release' which is referred to in Article 2.3 of the form Subcontract as 'Exhibit D', and neither Pride nor Brown ever provided Pioneer with the form which is referred to in article 2.3 as 'Exhibit E', which form is believed to be a 'final release'. Pioneer never signed any form of 'final release'.

(Id.)

Pioneer, however, did sign at least fifteen (15) partial releases during the course of the Project.  (Subcontractor Partial Release, Dkt. 38-10, at 1-15.)  The earliest release was signed by Michael Cavage, Vice President of Pioneer, on July 13, 2004, and the last partial release provided to the Court was signed on December 5, 2005 by Robert Jenkins, Project Manager at Pioneer.  (Id. at 1, 15.)  Each of the releases included the following terms:

---

form the predicate for the analyzing the summary judgment motion.

1.  The undersigned does hereby release all Mechanic's Liens Rights, Miller Act Claim (40 USCA 270), Stop Notice, Equitable Liens and Labor and Material Bond Rights resulting from labor and/or materials, subcontract work, equipment or other work, rents, services or supplies heretofore, furnished in, and, for the construction, design, improvement, alteration, additions to or repair of the above described project.

2.  This release is given for and in consideration upon receipt of the _____ requisition.  (Subcontractor to insert month ending date (month, day and year) on line above for current payment period)

. . . .

4.  It is acknowledged that this release is for the benefit of and may be relied upon by the owner, the contractor, and construction lender and the principal and surety on any labor and material bond for the project.

5.  In addition to the foregoing this instrument shall constitute a <u>partial release</u> of all rights, claims and demands of the undersigned against the contractor arising out of or pertaining to the above referenced project.  If partial, all rights and claims on the project are released up to and including the _____ requisition. (Subcontractor to insert month ending date (month, day and year) on line above for current payment period)

(<u>Id.</u> at 1-15.)

Pioneer did not insert any language limiting the scope of, or otherwise exempting any delay claims, from the language of release that it submitted.  (<u>Id.</u> at 1-15.)  Furthermore, there is no specific section in the release for limiting the extent of the release.  (<u>Id.</u>)  Nor does the form provide any advice for excepting or "carving out" any delay claim.

As noted above, the last partial release was signed on December 5, 2005.  In the blank space for the applicable requisition, Jenkins wrote "17."  (<u>Id.</u> at 15.)  Pioneer's last requisition was paid in March, 2006.  (PSUMF, Dkt. 42, at ¶ 14.)

The NPS extended the Project's completion date on several occasions.  (Williams Dec.,

Dkt. 38-5, at ¶ 11.)  Defendants assert:

> Pioneer was aware of each extension of the completion date, as well as the circumstances leading up to each extension, as they occurred, and was aware that Pioneer's own work would be impacted.  NPS compensated Pride for the effect of these delays, and Pride in turn negotiated numerous change orders – formal amendments to Pioneer's Subcontract – with Pioneer by which Pioneer was compensated for the effect of any delays suffered by Pioneer.

(Id. at ¶ 11.)  Pioneer, however, contends that it was not aware of the extensions and that the extensions were "without Pioneer being so informed by Pride or Brown."  (PSUMF, Dkt. 42, at ¶ 15.)  Moreover, Pioneer denies being compensated by Defendants for any additional expenses relating to each of the delays.  (Id. at ¶ 16.)  In this regard, although the "Change to Subcontract" documents identify the amount by which the contract will be increased, there is no indication of any additional compensation for delays.  (Change to Subcontract, Dkt. 38-11, at 1-22.)

The actual date of substantial completion of the project was April 30, 2006, 520 days after the planned completion date of November 26, 2004.  (Equit. Adjust. Claim, Dkt. 38-13, at 7.)  Pioneer's work, however, essentially was completed by December 2, 2005.  (Id.)  Pioneer admits that "the acts or omissions by Pride, Brown and/or the NPS . . . occurred prior to December 5, 2005." (DSUMF, Dkt. 39, at ¶ 17.)

Long before Pioneer's demobilization in December of 2005, Pride had contacted Pioneer regarding the delays experienced over the course of the project.  On February 17, 2005, over a year before the Project was complete, Steve Saddlemire, the Pride Project Executive, wrote to

Jenkins of Pioneer:

> Pride/JMB is investigating a delay claims [sic] against the National Park Service. We are looking for your assistance in documenting this position. It is not going to be easy given the many self inflicted wounds we have endured over the course of this project. I am requesting that you review your documentation and consult with outside resources to establish a credible position for a delay claim. You must maintain the perspective that Pride/JMB and/or yourselves have not influenced the position in any way.

(Feb. 17, 2005 Letter, Dkt. 46, at 64.)

On October 10, 2005, Joseph Mirin, Project Superintendent, employed by Brown, e-mailed Jenkins to request that he "procure all Claim information pertaining to the Grey Towers NHL Project no later then Wednesday[,] October 12, 2005." (Oct. 10, 2005 E-mail, Dkt. 46, at 89.) Mirin indicated that he had been asking for this information for over nine (9) weeks and that the information needed to detail "delays, dates, time durations, modifications, and inefficiencies." (Id.)

On October 11, 2005, Jenkins responded to Mirin, stating:

> As you know we have been in daily contact regarding the information you are requesting for our claim. I have been working on compiling this information for a few weeks now. As you know there are a lot of different circumstances which make up this claim and it requires a lot of time to put it together due to its size. As soon as it is completed and reviewed by our legal counsel you will receive it and not until then. We have too much at stake to rush this process. As you know a big reason for this claim is delays in information form [sic] the NPS so let them wait a few more days for this information as they have done to us.

(Oct. 11, 2005 Letter, Dkt. 46, at 96.)

On November 7, 2005, Pioneer sent Pride documents outlining its Statement of Claim.

(Dkt. 38-12, at 1-21.)  Pride acknowledged receipt of the claim in a November 23, 2005 letter from then-Project Executive Michael J. Flynn.  (Dkt. 46-2, at 8.)  Finding the claim "lacking in analysis and support," Pride and returned it to Pioneer for revision.  (Williams Dec., Dkt. 38-5, at ¶ 15.)  At a March 22, 2006 meeting, the parties discussed the claim "at some length," as were the "releases to [the] Government which were a big part" of the claim.  (Dkt. 46-2, at 18.)

In January 2007, Pioneer submitted to Pride a revised "Claim for Equitable Adjustment to Subcontract Price and Time."  (DSUMF, Dkt. 39, at ¶ 24.)  In a March 21, 2007, letter, Craig Williams, President and CEO of Pride, indicated that the Claim should be treated as a certified claim under the Contract Disputes Act and that he certified,

> in accordance with the Contract Disputes Act, 41 U.S.C. § 605(c)(1) and applicable law, that the Claim is made in good faith; that the supporting data are accurate and complete to the best of [his] knowledge and belief; that the amount requested accurately reflects the contract adjustment for which Pride Enterprises believes the Government is liable; and that [he is] duly authorized to certify the claim on behalf of . . . Pride Enterprises.

(March 21, 2007 Letter, Dkt. 44, at 3.)  Neither Pride nor Brown advised Plaintiff that the Claim would not be certified because it was barred by any partial release.

In a letter dated December 14, 2007, the Contracting Office of the NPS denied Pioneer's claim for recovery.  (Final Decision, Dkt. 38-14.)  The denial letter stated, in part, that although Pioneer did incur delays under the Subcontract with Pride, "the Government compensated Pride for these delays on the contract, including delays incurred by Pioneer, through bilateral modifications that contained releases from Pride."  (Id. at 5.) The letter added

8

that, "[t]o the extent that Pioneer incurred additional costs and delays for these events, Pioneer needs to seek redress through Pride." (Id.)

On May 30, 2007, Plaintiff filed the current action. On September 29, 2008, before the close of discovery, Defendant filed a Motion to Deem Certain Requests for Admissions as Admitted (Dkt. 35), and a Motion for Summary Judgment (Dkt. 38). Both motions have been fully briefed and are ripe for review.

## II. DISCUSSION

### A. Standard of Review

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). "Facts that could alter the outcome are material facts." Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 197 (3d Cir. 1994). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

Initially, the moving party must show the absence of a genuine issue concerning any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). All doubts as to the

existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its burden, the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson, 477 U.S. at 257. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). Rule 56 requires the entry of summary judgment if there was adequate time for discovery and a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

B. Signed Partial Releases

Defendants argue that the partial releases executed by Plaintiff bar the damages currently sought. The forms at issue, entitled "Subcontractor Partial Release," purport to release all claims arising from work that has been satisfactorily paid by the contractor. (Dkt. 38-10.) When signing and submitting these releases to Pride, Pioneer did not mentioned that it intended to make a delay claim and did not carve out a claim on any of the releases. Although not physically written on any release, Pioneer avers that it made such a claim apart from the contractual payment-release process.

10

"Under Pennsylvania law, a release is a contract and governed by the rules of contract construction."[3] G.R. Sponaugle & Sons, Inc. v. Hunt Const. Group, Inc., 366 F. Supp. 2d 236, 242 (M.D. Pa. 2004) (citations omitted). "'In Pennsylvania, it is well settled that the effect of a release is to be determined by the ordinary meaning of its language.'" Id. (quoting Taylor v. Solberg, 778 A.2d 664, 667 (Pa. 2001)); see Kenneth Hantman, Inc. v. Whiting-Turner Contracting Co., Civ. A. No. 07-1574, 2008 WL 4072591, at *6 (E.D. Pa. Sept. 2, 2008). "Consistent with this approach, a party cannot evade the clear language of a release by contending that the party did not subjectively intend to release the claim at issue." G.R. Sponaugle, 366 F. Supp. 2d at 242-43 (citing Jordan v. SmithKline Beecham, Inc., 958 F. Supp. 1012, 1020 (E.D. Pa. 1997)).

Courts have given effect to executed partial release forms similar to those at issue here. For example, in Kleinknecht Elec. Co. v. Jeffrey M. Brown Assoc., Inc., No. 4997, 2006 WL 1005007, at *3 (Pa. Ct. Cm. Pl. Apr. 10, 2006), the plaintiff alleged that the defendant had made the work "more costly by changing the planned scope and sequence of work and delaying change order approvals and design decisions." The court determined, however, that the plaintiff's claims were barred by an executed partial release. Id. at *3.

Here, Plaintiff claims that the parties' course of conduct should be analyzed in

---

[3] "The subcontract provides that the law of the Commonwealth of Pennsylvania shall be applicable to disputes arising out of or relating to the subcontract." (Subcontract, Dkt. 38-8, at 7.)

11

interpreting the partial release.  "There is authority for considering course of conduct in interpreting a contract."  G.R. Sponaugle, 366 F. Supp. 2d at 244 (citing Matthews v. Unisource Worldwide, Inc., 748 A.2d 219, 222 (Pa. Super. Ct. 2000); Robinson Protective Alarm Co. v. Bolger & Picker, 487 A.2d 373, 379 n.15 (Pa. Super. Ct. 1985), rev'd on other grounds, 516 A.2d 299 (Pa. 1986) ("Contracts may be read in the light of a course of conduct even when the terms are clear and unambiguous.")).  The Pennsylvania Supreme Court has held that the "course of performance is always relevant in interpreting a writing."  Atl. Richfield Co. v. Razumic, 390 A.2d 736, 741 n.6 (Pa. 1978).  Citing the Restatement (Second) of Contracts, it explained that "'the parties to an agreement know best what they meant, and their action under [the agreement] is often the strongest evidence of their meaning.'"  Id. (quoting Restatement (Second) of Contracts § 228 comment g).  Accordingly, under Pennsylvania law, "[a] contract must be interpreted in light of the meaning which the parties have accorded to it as evidenced by their conduct in its performance."  Capitol Bus Co. v. Blue Bird Coach Lines, Inc., 478 F.2d 556, 560 (3d Cir. 1973); see Philips Elec. & Pharm. Indus. Corp. v. Leavens, 421 F.2d 39, 45 (3d Cir. 1970) ("A well recognized principle of contract law requires that the terms of a contract be interpreted in light of the meaning which the parties themselves have attached to them as evidenced by their subsequent conduct."); Am. Cyanamid Co. v. Ellis-Foster Co., 298 F.2d 244, 246 (3d Cir. 1962) ("what the parties do under a contract is highly important in determining the meaning of the agreement which they have made"); Sternbergh v. Brock, 74 A. 166, 169 (Pa.

1909) ("'Contemporary construction of a contract by acts of the parties is entitled to very great weight, but it ought to appear with reasonable certainty that they were acts of both parties, done with knowledge, and in view of a purpose at least consistent with that to which they are now sought to be applied.'").

"'Course of performance' is a sequence of conduct between the parties subsequent to formation of the contract during performance of the terms of the contract.'" J.W.S. Delavau, Inc. v. E. Am. Transp. & Warehousing, Inc., 810 A.2d 672, 683 (Pa. Super. Ct. 2002). "Pennsylvania case law indicates 'course of performance' can only be used to interpret, but not to supplement, the terms of an existing agreement." Id.

> '[T]he parol evidence rule 'has never barred the introduction of clear, precise, and convincing evidence to show that the party who seeks to enforce the written agreement according to its tenor has admitted and acknowledge that the <u>agreement as written did not express what the parties intended</u> and that what the parties intended was omitted from the written agreement.'

Sun Co., Inc. (R&M) v. Pennsylvania Tpk. Comm'n, 708 A.2d 875, 879 (Pa. Cmwlth. Ct. 1998) (quoting Coal Operators Cas. Co. v. Charles T. Easterby & Co., 269 A.2d 671, 673 (Pa. 1970)). "Even when a contract seems unambiguous . . . 'the course of performance of the parties is always relevant in construing a contract.'" Prudential Ins. Co. of Am. v. Prusky, 413 F. Supp. 2d 489, 493-94 (E.D. Pa. 2005) (quoting Prusky v. Prudential Ins. Co. of Am., Civ. A. No. 00-2783, 2001 WL 34355665 (E.D. Pa. Oct. 30, 2001)).

"A court, therefore, may look to the parties' course of conduct to determine whether a

13

contract is ambiguous, and/or to resolve an ambiguity." Prusky, 413 F. Supp. 2d at 494

(citations omitted).  The Third Circuit has held

> that 'to decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear . . . . We consider the contract language, the meanings suggested by counsel, the extrinsic evidence offered in support of each interpretation.  Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.'

Bethlehem Steel Corp. v. United States, 270 F.3d 135, 139 (3d Cir. 2001) (quoting Teamsters

Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir.

1993)).

Plaintiff points to course of conduct evidence that supports its position.  For instance,

Pride's letter of February 17, 2005 to Plaintiff stated:

> Pride/JMB is investigating a delay claims against the National Park Service.  We are looking for your assistance in documenting this position.  It is not going to be easy given the many self inflicted wounds we have endured over the course of this project.
> I am requesting that you review your documentation and consult with outside resources to establish a credible position for a delay claim.  You must maintain the perspective that Pride/JMB and/or yourselves have not influenced the position in any way.

(Feb. 17, 2005, Dkt. 46, at 64.)

In this case, Defendants supported and encouraged Plaintiff's delay claim

notwithstanding the execution of partial releases.  At the time of Defendant's February 17, 2005

letter encouraging a delay claim, Plaintiff had already signed nine (9) subcontractor partial

14

releases. (Dkt. 38-10.) Taking into consideration evidence offered by Plaintiff, including Steve Saddlemire's February 17, 2005 letter to Pioneer (Dkt. 46, at 64), Joseph Mirin's October 10, 2005 letter (Id. at 89), and Pioneer's October 11, 2005 response (Id. at 96), there is support for the position that the parties did not intend the releases to bar subsequent delay claims. At a minimum, this extrinsic evidence suggest that the release language is ambiguous. Bethlehem Steel, 270 F.3d at 139. Defendants' course of conduct supports an inference that the parties intended to disregard the release terms. See Prusky, 413 F. Supp. 2d at 493-94. Defendants' correspondence with Pioneer plausibly suggests that the agreement as written did not express the parties' intention to bar a delay claim. See Sun Co., 708 A.2d at 879. The parties' actions during the course of the Project in both failing to require a release to accompany the first three payments (PSUMF, Dkt. 42, at ¶ 8), and encouraging Plaintiff to prepare a delay claim (Dkt. 46, at 64, 89, 96; Dkt. 46-2, at 18), support a conclusion that the parties did not intend the release clause to bar future claims. See At. Richfield, 390 A.2d at 741; Capitol Bus Co., 478 F.2d at 560; Am. Cyanamid Co., 298 F.2d at 246; Philips Elec. & Pharm., 421 F.2d at 45. There is thus a question of fact pertaining to the interpretation of the partial releases. Accordingly, Defendants' Motion for Summary Judgement will be denied.

C. Delay Damages Against Great American

In addition to Defendants' argument that the releases bar Plaintiff's claims, Defendants also aver that delay damages cannot be recovered against Great American. (Supp. Brief, Dkt.

40, at 25.)  Specifically, Defendants assert that "[u]nder Pennsylvania law, delay damages are not recoverable against sureties, unless the bond expressly states that delay damages are covered."  (Reply Brief, Dkt. 49, at 24.)

The unsound premise of Defendants' argument is that the liability of the surety is controlled by state law.  The bond in question, however, was issued pursuant to the Miller Act, federal legislation.  Nearly thirty (30) years ago, the Court of Appeals for the District of Columbia Circuit declared that "[i]t is well settled that federal law governs the rights and obligations of a Miller Act surety." United States for use & benefit of Heller Elec. Co., Inc. v. William F. Klingensmith, Inc., 670 F.2d 1227, 1231 n.20 (D.C. Cir. 1981) (citing F.D. Rich Co. v. Indust. Lumber Co., Inc., 417 U.S. 116, 127 (1974)).

The Miller Act provides that "[b]efore any contract of more than $100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, a person must furnish to the Government [a performance bond and a payment bond], which become binding when the contract is awarded." 40 U.S.C.A. § 3131(b).  "The Miller Act represents a congressional effort to protect persons supplying labor and material for the construction of federal public buildings in lieu of the protection they might receive under state statutes with respect to the construction of non-federal buildings." United States for Benefit and on Behalf of Sherman v. Carter, 353 U.S. 210, 216 (1957).

The obligation language of the Great American bond provides:

16

> We the Principal and Surety(ies) are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum [$3,899,821.00]. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum 'jointly and severally' as well as 'severally' only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

(Payment Bond, Dkt. 38-7, at 1.) The bond is silent with respect to that matter of liability for delay damages.

Significantly, the cases upon which Defendants rely – Lite-Air Prods., Inc. v. Fidelity & Deposit Co. of Maryland, 437 F. Supp. 801, 804 (E.D. Pa. 1977), and Salvino Steel & Iron Works, Inc. v. Fletcher & Sons, Inc., 580 A.2d 853 (Pa. Super. Ct. 1990) – were decided under state, not federal law. In Lite-Air Products, the court construed a Pennsylvania state statute analogous to the Miller Act and determined that "the surety is not liable for the damages caused by the negligence of the principal in causing a delay." Lite-Air Products, 437 F. Supp. at 804. The court relied upon extant Miller Act authority in support of its conclusion, citing United States v. Guy H. James Construction Co., 390 F.Supp. 1193 (M.D. Tenn.1972), aff'd, 489 F.2d 756 (6th Cir. 1973).

A more recent decision by a judge of the Eastern District of Pennsylvania, however, reached a contrary conclusion when considering the liability of a surety under a Miller Act bond. In United States for the use of Joseph P. Sulzbach, Inc. v. Cottman Mech. Contractors, Inc.,

Civ. A. No. 92-4378, 1993 WL 533114 (E.D. Pa. Dec. 23, 1993), the Hon. Norma Shapiro, after

canvassing the authority, stated that although the Third Circuit had not yet addressed the issue,

a number of other courts of appeals "have held that subcontractors can recover the out-of-

pocket costs of delay from a Miller Act surety." Sulzbach, Inc., 1993 WL 533114, at *4 (citing

United States for use of Lochridge-Priest, Inc. v. Con-Real Support Group, Inc., 950 F.2d 284,

287 (5th Cir. 1992); United States for use of T.M.S. Mech. Contractors, Inc. v. Millers Mut. Fire

Ins. Co. of Texas, 942 F.2d 946, 953 (5th Cir. 1991); United States for use of Pertun Const. Co.

v. Harvesters Group, Inc., 918 F.2d 915, 918 (11th Cir. 1990); United States for use of Heller

Elec. Co., Inc. v. Klingensmith, Inc., 670 F.2d 1227, 1230-31 (D.C. Cir. 1982)).  In Heller, the

court concluded that delay damages should be viewed as compensation for the increased costs

of labor, services, and materials, items for which payment had been guaranteed by the bond.

Heller Elec. Co., Inc., 670 F.2d at 1232.  As such, "a surety is liable for the value of material

and services provided at the time they were provided, and hence, the surety is liable for delay

damages." Id.  In Mai Steel Service, Inc. v. Blake Construction Co., 981 F.2d 414, 418 (9th Cir.

1992), the court observed that "increased out-of-pocket costs caused by construction delays fall

within the intended coverage of the Miller Act.  Thus, a subcontractor may recover these costs

from a Miller Act surety."  In Sulzbach, Judge Shapiro found that the purpose of the Miller Act

"can only be achieved by permitting a subcontractor to recover for all costs of labor and

material supplied in performing under the contract, including amounts incurred because of

delay." Sulzbach, 1993 WL 533114, at *4.

I find to be compelling the reasoning of the Eastern District of Pennsylvania in Sulzbach as well as the Courts of Appeals for the Fifth, Ninth, Eleventh, and District of Columbia Circuits. The purpose of the Miller Act is maintained by allowing Plaintiff to seek delay damages from a surety. Accordingly, Defendants' Motion for Summary Judgment as to the delay claims against Great American will be denied.

D. Motion for Admissions

Defendants also move for this court to deem certain requests for admissions as admitted. Defendants aver that Plaintiff's response to request number eleven (11) in Defendants' First Set of Requests for Admissions is "evasive, ambiguous, argumentative, and otherwise non-responsive." (Dkt. 41, at 2.) Although Plaintiff's response to request number eleven (11) does improperly include argument in support of its position, Plaintiff does clearly admit that "'the acts or omissions by Pride, JMB and/or the NPS . . . occurred prior to December 5, 2005.'" (Dkt. 38-16, at 9.)

Because Plaintiff admits that the acts or omission by Pride and/or the NPS that allegedly caused Plaintiff to incur the increased costs and delays, occurred prior to December 5, 2005 (see Dkt. 38-16, at 9; Dkt. 48, at 5), Defendants' Motion to Deem Certain of their Requests for Admissions as Admitted and/or to Determine the Sufficiency of Plaintiff's Response to Defendants' First Set of Requests for Admission (Dkt. 35) will be granted.

19

III. CONCLUSION

For the above-stated reasons, Defendants' Motion for Summary Judgment (Dkt. 38) will be denied.  Defendants' Motion to Deem Certain of their Requests for Admission as Admitted and/or to Determine the Sufficiency of Plaintiff's Response to Defendants' First Set of Requests for Admission (Dkt. 35) will be granted.  An appropriate order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA FOR THE   :
USE OF PIONEER CONSTRUCTION CO.   :
INC.   :
             Plaintiff   :
  :
     v.   :     3:CV-07-0994
  :     (JUDGE VANASKIE)
PRIDE ENTERPRISES, INC.,   :
GREAT AMERICAN INSURANCE CO.   :
           Defendants   :

ORDER

NOW, THIS 25th DAY OF NOVEMBER, 2009, for the reasons set forth in the foregoing memorandum, IT IS HEREBY ORDERED THAT:

1.  Defendants' Motion for Summary Judgment (Dkt. 38) is DENIED.

2.  Defendants' Motion to Deem Certain of Their Requests for Admissions as Admitted and/or to Determine the Sufficiency of Plaintiff's response to Defendants' First Set of Requests for Admission (Dkt. 35) is GRANTED.

3.  A telephone scheduling conference will be held on Tuesday, December 22, 2009, at 1:30 p.m.  Plaintiff's counsel is responsible for placing the call to (570) 207-5720, and all parties should be ready to proceed before the undersigned is contacted.

                      s/ Thomas I. Vanaskie
                      Thomas I. Vanaskie
                      United States District Judge